UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
TYLER DIVISION

| | | |
|---|---|---|
| ROBERTO RAMIREZ and THOMAS IHLE, | § | |
| | § | Civil Action No.6:14- |
| Plaintiffs, | § | cv-00601 |
| | § | |
| -against- | § | JURY TRIAL DEMANDED |
| | § | |
| J. C. PENNEY CORPORATION, INC., | § | |
| MICHAEL DASTUGUE, JANET DHILLON, | § | CLASS ACTION |
| KENNETH HANNAH, MICHAEL | § | |
| KRAMER, RONALD JOHNSON, and | § | |
| MYRON E. ULLMAN, III, | § | |
| | § | |
| Defendants. | § | |

**FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS
OF THE EMPLOYEE RETIREMENT INCOME SECURITY ACT**

Plaintiffs Roberto Ramirez and Thomas Ihle, individually and on behalf of the

class of other similarly situated employees and former employees who were participants

in and beneficiaries of the J. C. Penney Corporation, Inc. ("JC Penney" or the

"Company") Savings, Profit-Sharing and Stock Ownership Plan (the "Plan") allege the

following based upon the investigation of counsel, which included a review of Plan

documents (provided by the Company in response to a request) governing the operations

of the Plan; a review of Internal Revenue Service Form 5500s ("Form 5500s") filed by

the Plan with the United States Department of Labor ("DOL"); discussions with Plan

participants; filings by JC Penney with the United States Securities and Exchange

Commission ("SEC"); and press releases and other public statements issued by the

Company.  Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.    SUMMARY OF THE ACTION

1.    This is a class action brought against the Plan Fiduciaries by its participants pursuant to Section 502 of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132.   The Plan is sponsored by JC Penney for eligible employees and is a defined contribution plan.  This class action is brought on behalf participants in the Plan who invested in and/or held the JC Penney Common Stock Fund between November 1, 2011 and September 27, 2013 (the "Class Period").

2.    The Plan Fiduciaries knew and/or participated in a fraudulent scheme by JC Penney's senior officers and directors to deceive the public markets, including Plan participants (JC Penney's employees), about the Company's true financial condition, as well as the costs and progress of its "transformational" new "Fair and Square Pricing" plan and store redesigns.   This deception occurred through false statements made by JC Penney and its officers in its earnings releases and SEC filings, which caused JC Penney's stock price to trade an artificially inflated price.

3.    The Plan Fiduciaries knew of these materially false and misleading communications, and, therefore, knew that JC Penney's stock had become an imprudent and artificially overpriced investment due to these materially false and misleading disclosures.   The Plan Fiduciaries also knew that these materially false and misleading disclosures were relied on by the independent Plan Trustee appointed to manage and monitor the JC Penney Common Stock Fund as an investment option under the Plan.  As a result, the Plan Fiduciaries knew that JC Penney Common Stock Fund was an

imprudent investment and that the Plan Trustee lacked the necessary and required information to protect the Plan participants.

4.    In February 2011, William Ackman ("Ackman") joined the Board of Directors of JC Penney's parent company, J.C. Penney Company, Inc. ("JC Penney Co."). Ackman was a well-known hedge fund manager whose fund, Pershing Square Capital Management LP, owned approximately 18% of JC Penney's stock. Ackman, who is famous as an "activist investor," joined JC Penney Co. so that he could direct JC Penney's strategic turnaround plans.

5.    After joining the Board, Ackman hand-picked a new Chief Executive Officer ("CEO") for JC Penney, Ron Johnson, who was formerly at Apple Inc. ("Apple"), the computer and mobile device retailer, and who became a Plan Fiduciary (and is now a Defendant in this case). Ackman claimed that he hired CEO Johnson specifically so that he could implement "transformative" changes at JC Penney, modeling the success of Apple. In fact, the hiring of Johnson, and these "transformative" changes that he spearheaded, ultimately had an enormous negative impact on JC Penney. Indeed, the most charitable understanding of these decisions is that they were made to goose Ackman's short-term stock position at the expense of the company as a whole.

6.    On November 20, 2011, Johnson took over at JC Penney. He immediately began to implement his "transformative" changes at JC Penney. Johnson, however, refused to engage in any testing of his strategic changes to see if the JC Penney's customer base would be receptive to the proposed changes in the new pricing structure and product line. This lack of testing meant that Johnson essentially gambled with JC Penney's long-term, established customer base and business.

7.     On January 25 and 26, 2012, Johnson announced his transformative changes for JC Penney.  His changes included "Fair and Square Pricing," which eliminated all coupons and discounts for JC Penney's customers.  He also announced plans to open "stores within stores" at JC Penney's retail stores, lining up many new brands that JC Penney had not previously carried.   Johnson represented to JC Penney's employees and investors that his changes would increase profit margins and would be "self-funded" by cost savings from the simplification of JC Penney's business.

8.     Over the next year, in his capacity as CEO of JC Penney, Johnson made numerous false and misleading representations about the progress and success of his "transformation plans" and its impact upon JC Penney's financial condition.   His statements lacked a reasonable basis in fact due to his failure to engage in any advance market testing.  For example, Johnson knew that over 60% of JC Penney's customers made purchases using coupons; thus, his representations that these customers would continue to shop at JC Penney's after the elimination of coupons lacked a reasonable basis.

9.     Over the next few quarters, as his changes were implemented, Johnson continued to make false and materially misleading statements about the progress of his transformation of JC Penney, JC Penney's customers' acceptance of the new pricing and product lines, and the progress towards sustained growth and profitability.   Instead of progress, JC Penney's losses increased each quarter and gross profit margins decreased. The only transformation which resulted from Defendant Johnson's changes was the deterioration of JC Penney's financial condition.

10.     JC Penney and Defendant Johnson issued false and materially misleading statements in earnings releases during the Class Period, as well as direct communications to JC Penney's employees.   Every 25 days, JC Penney's employees were directed to training rooms to view video-taped speeches by Defendant Johnson.  In the videos, CEO Johnson made false and misleading statements about the progress of the changes, and their acceptance by customers.  He sought to generate a sense of momentum and progress with the JC Penney's employees.

11.     The Plan Fiduciaries knew that JC Penney's and Defendant Johnson's representations were false and materially misleading.   As Board members, they had access to internal financial information about JC Penney's progress, including budgeting, vendor and other financial projections.   They knew that JC Penney's revenues were falling, costs were increasing, gross profit margins were falling, and that customers were not receptive to the new strategic changes.   They knew that JC Penney was not on course towards sustained profitability or growth, but that its financial condition and liquidity were deteriorating.   Therefore, the Plan Fiduciaries could easily understand *why* JC Penney's and Defendant Johnson's public representations were misleading.

12.     Of course, it practically goes without saying that Defendant Johnson well knew that his own public statements were false and misleading.  As both CEO and a Plan Fiduciary, he would have been able to understand perhaps better than anyone how the improper inflation of JC Penney's stock price could ultimately damage Plan participants who bought and owned that stock.

13.     And because of their position as Board members and senior executives, the Plan Fiduciaries also were aware of Defendant Johnson's misleading public

statements as they were made, as well as JC Penney's false and misleading public disclosures as they were filed. They would have understood that these false public statements and disclosures were misleading investors as to the real value of JC Penney's stock, causing JC Penney's stock price to trade at an artificially high value. As Plan Fiduciaries, they should have recognized that continued acquisition of JC Penney stock at an artificially high price was harming Plan participants, whose holdings would inevitably plummet in value when the truth of JC Penney's misrepresentations finally emerged.

14.     The Plan Fiduciaries could have acted upon their information in ways that would have protected Plan participants—to whom the Plan Fiduciaries owed "the highest duty known to the law"—without violating insider trading laws or other legal obligations. First, they could have directed the Plan Trustee to halt new purchases of JC Penney stock. Second, they could have used their authority as Board members to make fulsome disclosure of the truth to the public, the Plan Trustee, and Plan participants all at the same time—in other words, they could have told the truth instead of allowing JC Penney's and Defendant Johnson's misrepresentations to continue unchecked. Either or both of these actions are what a prudent fiduciary ought to have done in this situation.

15.     Nor can the Plan Fiduciaries excuse their failure to take *any action whatsoever* to protect Plan participants by claiming that taking one or both of the above actions would have harmed the JC Penney stock price and thereby harmed Plan participants. The fact is, disclosing the truth about a public corporation after material misrepresentations have been made will *always* cause the stock price to decline; that is precisely how misrepresentations harm investors in the first place. But the longer the

Plan Fiduciaries remained silent, the greater the harm to Plan participants their inaction ultimately caused.

16.    In sum, the Plan Fiduciaries breached their fiduciary duties to Plan participants who invested in or held the JC Penney Common Stock Fund through the Plan.   The Plan Fiduciaries knew that JC Penney's common stock was an imprudent investment because it was artificially inflated in value due to the Company's false and materially misleading disclosures.   The Plan Fiduciaries knew that the Plan Trustee, which was responsible for managing and monitoring the JC Penney Common Stock Fund, lacked knowledge of the truth behind these misrepresentations, and thus lacked the information necessary to fulfill its fiduciary duties to the Plan and Plan participants properly.   Notwithstanding, the Plan Fiduciaries took no action, when they could have—and should have—directed the Plan Trustee to halt new purchases on behalf of the JC Penney Common Stock Fund and/or used their position as Board members to force the Company to issue curative disclosures.

17.    As a result, the Plan Fiduciaries are liable for foreseeable losses suffered by the Plan participants during the Class Period, pursuant to ERISA § 409(a), 29 U.S.C. § 1109(a).   In addition, under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), Plaintiffs seek appropriate equitable relief including, without limitation, the equitable remedy of surcharge, restitution, monetary relief and lost profits from alternative prudent investments.

## II.     JURISDICTION AND VENUE

18.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1).

19.     Venue is proper in this district pursuant to ERISA § 501 (e)(2), 29 U.S.C. § 1132(e)(2), because the Plan was administered in this district, some or all of the fiduciary breaches for which relief is sought occurred in this district, and/or some defendants reside or maintain their primary place of business in this district.

20.     Specifically, this district is an appropriate venue for this action because the Plan's I.R.S. Form 5500 annual filings list the address of the Plan in this district.  Further, the principal executive offices of JC Penney are located in this district. Additionally, it is likely that many of the parties and potential witnesses, including the Plan's Fiduciaries are located in or within close proximity to this district.

## III.     PARTIES

21.     Plaintiff Roberto Ramirez is a Plan "participant" within the meaning of ERISA § 3(7), 29 U.S.C. § 1102(7).   He is a former employee who purchased and held the JC Penney Common Stock Fund in his retirement account through the Plan during the Class Period.   In April 2014, he retired from JC Penney.

22.     Plaintiff Thomas Ihle is a Plan "participant" within the meaning of ERISA § 3(7), 29 U.S.C. § 1102(7).  He is a current employee who purchased and held the JC Penney Common Stock Fund in his retirement account through the Plan during the Class Period.

23.     Defendant J.C. Penney Corporation Inc. ("JC Penney") is a Delaware corporation with headquarters in Plano, Texas.  JC Penney's stock trades on the New

York Stock Exchange Inc. under symbol "JCP." JC Penney is and was the sponsor of the Plan within the meaning of ERISA § 3(16)(B), 29 U.S.C. § 1002(16)(B) and is a fiduciary of the Plan pursuant to ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that it had discretionary authority and control regarding the management of the Plan and/or the Plan's assets. JC Penney is a wholly-owned subsidiary of JC Penney Co.

24.     Defendant Michael Dastugue was a Plan Fiduciary within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A). From January 2011 through April 2012, he was a member of the board of directors of JC Penney, which has responsibility for the appointment of the Plan's trustee and monitoring of the JC Penney Common Stock Fund as an investment option under the Plan, while also serving as the Chief Financial Officer ("CFO") of JC Penney.

25.     Defendant Janet Dhillon was a Plan Fiduciary within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A). Throughout the Class Period, she was a member of the board of directors of JC Penney, which has responsibility for the appointment of the Plan's trustee and monitoring of the JC Penney Common Stock Fund as an investment option under the Plan, while also serving as the General Counsel of JC Penney.

26.     Defendant Kenneth Hannah was a Plan Fiduciary within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A). From May 2012 through the end of the Class Period, he was a member of the board of directors of JC Penney, which has responsibility for the appointment of the Plan's trustee and monitoring of the JC Penney Common Stock Fund as an investment option under the Plan, while also serving as the CFO of JC Penney.

27.     Defendant Ronald Johnson was a Plan Fiduciary within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).   From November 2011 through January 2013, he was a member of the board of directors of JC Penney, which has responsibility for the appointment of the Plan's trustee and monitoring of the JC Penney Common Stock Fund as an investment option under the Plan, while also serving as the CEO of JC Penney.

28.     Defendant Michael Kramer was a Plan Fiduciary within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).   From December 2011 through April 2013, he was a member of the board of directors of JC Penney, which has responsibility for the appointment of the Plan's trustee and monitoring of the JC Penney Common Stock Fund as an investment option under the Plan, while also serving as the Chief Operating Officer ("COO") of JC Penney, and as the interim CFO between April and May 2012.

29.     Defendant Myron E. Ullman, III was a Plan Fiduciary within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).   From April 2013 through the end of the Class Period, he was a member of the board of directors of JC Penney, which has responsibility for the appointment of the Plan's trustee and monitoring of the JC Penney Common Stock Fund as an investment option under the Plan, while also serving as the CEO of JC Penney.

## IV.     THE PLAN'S FIDUCIARIES AND MONITORING

30.     The Plan is a defined contribution benefit plan that is sponsored by JC Penney for eligible employees.   As of December 31, 2011, at or about the start of the Class Period, there were 168,372 employees or former employees of JCP who were participants in the Plan which had total assets of approximately $3.5 billion.

31.     Under the Plan's governing documents, an "Independent Fiduciary" may be "appointed" by the Board of Directors of JC Penney to be the "investment manager" of the JC Penney Common Stock Fund.  Further, the Board of Directors is tasked with the responsibility "to monitor the Independent Fiduciary as to its continued qualifications, capacity and personnel to discharge its obligations under the Plan."  The Plan also states that "[t]he Independent Fiduciary may be removed or replaced solely by an amendment to the Plan adopted by the Board of Directors of the Company."

32.     During the Class Period, the Board of Directors of JC Penney was comprised of some combination of Defendants in this case.

33.     Since December 17, 2009, under a trust agreement with JC Penney, Evercore Trust Company ("Evercore") has been the Independent Fiduciary with respect to the management and disposition of the JC Penney Common Stock Fund.  Evercore was responsible for monitoring the JC Penney Common Stock Fund as a prudent investment option for the Plan.   Evercore was also given authority and discretion to restrict or limit its offering as an investment, and to eliminate it as an option or even sell the stock.

34.     Nevertheless, the Board of Directors—the Plan Fiduciaries—remained responsible for the appointment and oversight of Evercore.   That is, notwithstanding Evercore's discretion, Evercore was ultimately answerable to the Plan Fiduciaries, which, through their positions as supervisors and overseers of Evercore, retained the equivalent of "veto power" over Evercore's actions as Plan Trustee.

35.     Indeed, the Board of Directors was imbued with further authority over the Independent Fiduciary and the JC Penney Common Stock Fund.  The Plan endowed the Board of Directors with exclusive authority to amend the Plan if that amendment is

"related to the Penney Stock Fund or the appointment of the Independent Fiduciary for the Penney Stock Fund[.]" This power to amend could be exercised by the Board of Directors "in its settler *or* fiduciary capacity" (emphasis added).

36.     The Plan Fiduciaries knew that Evercore relied only on "current and historical financial and other information relating to the Company" that was publicly available. Therefore, the Plan Fiduciaries knew that if JC Penney's publicly available current financial information was false or misleading that Evercore would rely on that false or misleading information in its management and monitoring of the JC Penney Common Stock Fund.

37.     During the Class Period, Defendants knew that the Plan was heavily concentrated in JCP stock, and that it suffered substantial losses. As of December 31, 2011, near the start of the Class Period, the Plan held approximately $514 million in the JCP Stock Fund. JCP's stock price on November 20, 2011 was $31 per share. As of December 31, 2012, the Plan held approximately $230 million in the JCP Stock Fund. The stock price on September 27, 2013 was $9 per share.

38.     The Plan suffered approximate losses during the Class Period of $350 million. Plan participants who invested in JCP common stock at artificially high prices were substantially damaged. Plan participants who held JCP stock falsely believing it was an appropriate investment for retirement suffered losses from holding JCP stock versus alternatives available under the Plan. Had Defendants acted prudently by causing Evercore to suspend transactions in JCP stock, or by providing truthful disclosure, Plan participants would have avoided the substantial damages that they suffered.

## V.    FACTS BEARING ON FIDUCIARY BREACH

### A. Ackman Hires CEO Johnson to Transform JC Penney

39.    JC Penney is a large retail department store that has been in business for over 110 years. It has approximately 1,142 stores throughout the United States and Puerto Rico.

40.    In February 2011, Ackman joined the Board of Directors of JC Penney Co. Ackman was well-known hedge fund manager whose fund, Pershing Square Capital Management LP ("Pershing Square"), held approximately 18% of JC Penney's stock. Pershing Square also had economic exposure to another 8% of JC Penney's stock through swap agreements. Ackman is an "activist investor" who joined the board so that he could direct and control JC Penney's strategic turnaround plans. Unfortunately for JC Penney employees, Ackman's motive appears not to have been a sustainable long-term growth plan for JC Penney, but rather a quick short-term profit on Pershing Square's investment.

41.    After joining the board, Ackman hand-picked a new CEO, Defendant Johnson, who formerly led retail strategy at Apple, the computer and mobile device retailer. Ackman hired Johnson specifically so that he could implement changes at JC Penney, purportedly modeling the success of Apple.

42.    On June 14, 2011, JC Penney announced Johnson's hiring effective November 1, 2011. Upon beginning as CEO, Johnson also joined the Board of Directors of JC Penney and became a Plan Fiduciary. A week later, JC Penney announced that Johnson would first assume responsibility for core merchandizing and marketing, then assume full CEO responsibilities and status on February 1, 2012. In the release, Johnson

stated that he was "thrilled" to help JC Penney "re-imagine what I believe to be the single greatest opportunity in American retail today, the Department Store."

43.     On November 1, 2011, Johnson joined JC Penney.  He immediately began to form strategic plans for "transformative" changes.    Johnson, however, refused to engage in any testing to see if the customer base would be receptive to the proposed changes.  Ackman later told an interviewer that Johnson refused testing because at Apple they did not test.

**B.  JC Penney Announces Its "Transformation" Plans**

44.     On January 25 and 26, 2012, Johnson held a two-day event for investors to announce the first of his transformative steps for JC Penney.   On day one, Johnson announced a new "Fair and Square Pricing" policy which eliminated JC Penney's prior practice of sales, coupons, rebates and retail "gimmicks."   JC Penney's new policy had three types of prices—the everyday price, a month-long value price and a best price offered on the first and third Fridays of every month.

45.     Additionally, he announced a new plan to "re-invent the JC Penney store experience."   This involved building 80 to 100 brand stores within the JC Penney store, rather than the traditional organization of "confusing and seemingly endless racks" in department stores.   He also announced that the JC Penney stores would have a "Town Square," or a center with a series of services for customers to enjoy both before and after they shop.   His plans further updating and increasing the number of new brands offered by JC Penney, and adopting new logos.

46.     JC Penney, on day two, provided its financial outlook for its transformative changes.   With the "simplification" of its business model, JC Penney

predicted lowered expenses and increased gross profit margins of 40%, or more. JC Penney also represented that its transformation would be completely "self-funded" as an anticipated $900 million in expenses cuts would offset the anticipated $800 million in capital expenditures to transform its stores.

47. In fact, Johnson stated that "we fully expect that the bold and strategic changes we are making to operations will result in improved profitability. This should enable us to fund the transformation of jcpenney's (sic) store experience, while at the same time returning value to shareholders with steady earnings growth."

48. As senior executives and Board members, the Plan Fiduciaries not only knew the extent of Johnson's transformative plans and changes at JC Penney, but they knew what the public—including Plan participants—did not know: that these strategies were untested and suspect. For example, at the time, approximately 62% of JC Penney's polled customers reported that they purchased only when items were on sale. The Plan Fiduciaries knew that neither Johnson nor any member of his team had done any substantive work to test whether these strategies would work, or whether there was actually a reasonable, sincere basis for the financial projections that JC Penney was making regarding these strategies. Because these strategies were untested and suspect, and financial projections pertaining to them were promulgated without any reasonable basis or evidence to support them, these projections were false and materially misleading—and the Plan Fiduciaries knew it.

## C. Employees Are Misled About JC Penney's "Transformative" Progress

49. On February 1, 2012, JC Penney began its new Fair and Square pricing at its stores. After the adoption of the new strategy, over the next year or so with Johnson

in charge, JC Penney's income and financial condition grew worse and worse. JC Penney reported increasingly larger losses nearly each quarter, its gross profit margins declined and its liquidity worsened causing it to increase its credit line and file to issue 84 million shares of common stock. While the Company's state deteriorated, Johnson misled the public about the progress of the "transformative plans."

50. As senior executives and Board members, the Plan Fiduciaries, would have been regularly apprised of the actual financial condition of JC Penney, and would have known that the Company had no reasonable basis for claiming that its "transformation" was "on track" or headed for improvement or about to turn a corner or the like. As Board members, they would have received, and been made aware of, internal financial projections that told a very different story—that JC Penney was heading for financial disaster.

51. Indeed, Defendants Dastugue, Kramer and Hannah, each of whom served as CFO for some portion of the Class Period, would have been responsible for the preparation of such projections. They were obligated to certify the financial results that released in each quarterly and annual filing, after all; it is reasonable to infer that they were responsible for the diligence and preparation underlying those results. Therefore, they would have been better-positioned than anyone to see that JC Penney's "transformative results" were not, in fact, having the positive impact that Johnson continued to claim.

52. As competent senior executives, the Plan Fiduciaries would have understood that Johnson's public statements on behalf of the Company expressing beliefs to the contrary were more than just sunny optimism or puffery, but rather were statements

of belief that Johnson had no reasonable basis for believing to be true, intended to keep JC Penney's stock price trading at an artificially high level.

53.     These misleading statements, made in JC Penney's Earnings Releases, included the following:

- <u>May 5, 2012 Earnings Release</u> – "Sales and profitability have been tougher than anticipated during the first 13 weeks, but the transformation is ahead of schedule. Customers love the new jcp they discover in our stores….***We fully expect that the bold and strategic changes we are making to operations will result in improved profitability and sustainable growth over the long term.***"

- <u>August 10, 2012 Earnings Release</u> –" We have now completed the first six months of our transformation and while business continued to be softer than anticipated, ***we are confident the transformation of jcpenney is on track***….This month we have simplified our pricing, launched the first of our new shops, and accelerated our marketing efforts to focus on brands, products and value.  ***Early response to these efforts has been very encouraging.***"

- <u>November 9, 2012 Earnings Release</u> – "While the quarter overall was challenging, the performance of jcp's new brands and shops reinforces our conviction to transform jcpenney into a specialty department store.  Today, jcp is really a tale of two companies.  By far the largest part of our store is the old jcpenney which continues to struggle and experience significant challenges as evidenced by our third quarter results.  ***However, the new jcp, centered around the shop concept, is gaining traction with customers every day and is surpassing our own expectations in terms of sales productivity which continues to give us confidence in our long term business model.***"

- <u>February 27, 2013 Earnings Release</u> – "Sales and customer traffic were below our expectations in 2012, but as we execute our ambitious transformation plan, ***we are pleased with the great strides we made to improve jcpenney's cost structure, technology platforms and the overall customer experience.   We have accomplished so much in the last twelve months.  We believe that the bold actions taken in 2012 will materially improve the Company's long-term growth and profitability.***"

54.     In addition, Johnson held regular video conferences for JC Penney store employees.   Every 25 days, JC Penney's sales associates and workers across approximately 1,100 stores were called into training rooms to watch video addresses given by CEO Johnson.   These speeches were intended to reinforce the Company's false

public representations regarding the current progress and success of JC Penney's "transformation plans." For example, during one conference Johnson announced to JC Penney employees the new brands that had agreed to open shops within JC Penney stores, and encouraged employees that they would soon reap the rewards of the new strategies.

55. Upon information and belief, JC Penney also limited the access of store and district managers to information outside of their stores and districts. Store and district managers were forced to rely on Johnson's speeches and the reports issued by the corporate office for their information on the progress of the changes at JC Penney.

56. On April 9, 2013, the Board of Directors of JC Penney Co. fired Johnson. During his tenure, JC Penney's financial situation deteriorated completely. As JC Penney's and Johnson's rosy assessment of the success of the "transformation" ran up against cold, hard reality, it became harder to keep the truth a secret. During his tenure, JC Penney's quarterly losses went from $55 million a quarter to over $552 million, its gross profit margins fell from 40% to 23%, and its stock price fell by over 50%. Johnson successfully "transformed" JC Penney to a company with problems to one approaching bankruptcy.

57. Even so, the full truth about the extent of JC Penney's deterioration had yet to emerge.

D. **Ackman's Public Letter to the Board of Directors**

58. Johnson was replaced as CEO by Defendant Ullman, who had been the CEO before Johnson. Upon his reinstatement, Ullman began to implement a reversal of

Johnson's strategic changes to re-focus JC Penney on its traditional business model and recapturing its traditional customer-base.

59. However, Ullman's appointment led to problems between Ackman and other Board members at JC Penney Co.

60. On August 9, 2013, Ackman issued a public letter to the directors of JC Penney Co., stating, in the first sentence, that "I think JC Penney is at a very critical stage in its history and its very existence is at risk."

61. Ackman's letter described turmoil within the Board of JC Penney Co., and accused other Board members of making decisions "behind his back." Ackman further reported that the Board members received three financial projections at their recent meetings—each one projecting worse results than the previous one. These projections gave the lie to the public optimistic statements previously issued by Johnson and JC Penney about the progress of the Company's transformation and its financial condition.

62. On August 13, 2013, shortly after his public letter, Ackman resigned from the Board of JC Penney Co. His stock position was bought out at $12.60 per share, separating him completely from the Company.

**E. JC Penney Also Misleads About Its Capital Position**

63. Even after suffering through the losses during Johnson's tenure, JC Penney continued to state publicly to investors that it had sufficient operating liquidity and capital.

64. As senior executives Board members, the Plan Fiduciaries, particularly Defendant Hannah, who was CFO at the time, would have been intimately acquainted the Company's liquidity position and would therefore have understood that public statements

made about that liquidity were misleading and were artificially enhancing the Company's already-troubled stock price. These misleading public statements included the following:

65.     During a May 16, 2013 investor call, Ullman indicated that the Company "had sufficient liquidity available to us to fund and return to profitable growth."

66.     On August 20, 2013, Hannah assured investors that "total liquidity available to the Company...[was] in excess of $1.5 billion at year-end given the improvements…in the [Company's] business."

67.     Notwithstanding these statements, however, on September 27, 2013, JC Penney shocked the market when it announced the pricing of 84 million shares of common stock in a secondary offering and indicated that it planned to "use the net proceeds from the offering for general corporate purposes."

68.     After this announcement, JC Penney's stock price fell 13% to $9.05 per share. This reaction was due to the fact that JC Penney had previously not been truthful to investors or its employees about its financial condition and liquidity situation.

## VI.     THE PLAN FIDUCIARIES' BREACHES

69.     During the Class Period, the Plan Fiduciaries breached fiduciary duties owing to the Plan and its participants. Their position as members of JC Penney's Board of Directors and as senior officers of the Company gave them a unique vantage point to understand the truth of the Company's financial situation, its financial projections, and its strategic plans. As senior executives and Board members, they would also have been aware of what statements about JC Penney's current and future financial condition were being made to the public—particularly Defendant Johnson, who was the person making the majority of those false statements. Therefore, when those misleading or false

statements were made, the Plan Fiduciaries would have known that they were false, and could have taken steps to ensure that those misrepresentations did not harm Plan participants.

70.     Plan Fiduciaries, as members of the Board of Directors that was responsible for overseeing Evercore, could have directed Evercore to cease new purchases of JC Penney stock during the Class Period, knowing that the stock was trading at artificially high prices due to the Company's material misrepresentations. Or, they could have amended the Plan to compel Evercore to cease new purchases. Such actions were well within the Plan Fiduciaries' authority and would not have violated the securities laws or any other legal obligation, but they would have protected Plan participants from some or all of the harm that was done to them.

71.     Plan Fiduciaries, as members of the JC Penney Board of Directors, could have worked to effectuate public corrections of the Company's numerous misrepresentations, thereby giving Plan participants (not to mention all other investors) honest and accurate information to rely on in making investment decisions regarding JC Penney stock. Those Defendants responsible for certifying JC Penney's financial results—Defendants Johnson and later Ullman (the CEOs) and Defendants Dastugue, Kramer and Hannah (the CFOs)—were in the perfect position to do so. Put another way, instead of waiting almost two years to finally come clean, the Plan Fiduciaries could have engineered truthful disclosures far earlier, and thus saved Plan participants from hundreds of millions of dollars in losses.

72.     As Plan Fiduciaries, they knew that there was over $500 million invested by JC Penney employees in the JC Penney Common Stock Fund through the Plan, and

that these investments were retirement savings made from payroll deductions. But despite this knowledge, and despite having at least the above two options available to them, Defendants **did absolutely nothing** to protect the Plan participants.

73. Defendants knew that JC Penney's stock price was artificially inflated due to the false and materially misleading public information issued by the Company. Defendants knew that JC Penney's stock price would suffer serious correction when the truth was revealed, and that the longer they waited, the worse that correction would be, to the point where it would devastate Plan participants' retirement savings. Yet Defendants failed to take any steps to protect the Plan and its participants from foreseeable losses.

74. Defendants further knew that the Independent Fiduciary, Evercore, was relying on insufficient and/or false public information in its management, oversight and monitoring of the JC Penney Common Stock Fund. Defendants knew that Evercore was unaware of the artificial inflation in JC Penney's stock price which made it an imprudent investment, or the foreseeable damage that would be caused to Plan participants when the truth emerged. Yet, just as they did nothing to correct the information on which Plan participants were relying, Defendants did nothing to correct the information on which Evercore was relying.

75. Instead, Defendants failed to engage in proper oversight, monitoring and supervision of Evercore, and permitted Evercore to act on false and materially misleading information.

76. By failing to take a single step to protect Plan participants from harm, Defendants breached their fiduciary duties to the Plan and its participants, and cause them to suffer foreseeable losses and damages.

## VII. CLASS ACTION ALLEGATIONS

77.    Plaintiffs bring this action as a class action pursuant to Federal Rule of Procedure 23(a), (b)(l) and/or (b)(2) on behalf of themselves and the following class of persons similarly situated (the "Class"):

> All individuals, excluding Defendants, who participated in the Plan and whose individual accounts purchased and/or held the JC Penney Common Stock Fund at any time between November 20, 2011, through September 27, 2013.

78.    Excluded from the Class are Defendants, the officers and directors of the Company, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

79.    The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are over 160,000 members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by JC Penney or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

80.    Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law complained of herein.

81.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in ERISA and securities class action litigation.

82.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a.      Whether Defendants each owed a fiduciary duty to the Plan, Plaintiffs and members of the Class;

b.      Whether Defendants breached fiduciary duties owed to the Plan, Plaintiffs and members of the Class by failing to act prudently and loyally and solely in the interests of the Plan and the Plan's participants and beneficiaries;

c.      Whether Defendants failed to provide sufficient material disclosure required under ERISA to the Plan participants;

d.      Whether the Defendants violated ERISA; and

e.      The extent to which Class members have sustained damages and the proper measure of those damages.

83.     Plaintiffs' claims are typical of the claims of the members of the Class because Plaintiffs and the other members of the Class each sustained damages and/or were negatively affected by Defendants' wrongful conduct in violation of ERISA as complained of herein.

84.     Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel highly competent and experienced in class action and complex litigation, including actions involving ERISA plans.  Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

85.     Class action status in this ERISA action is warranted under Rule 23(b)(1)(B) because this action is brought on behalf of the Plan and any prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to the Plan which would, as a practical matter, be dispositive of the interests of

the other members not parties to the actions, or substantially impair or impeded their ability to protect their interests.

86.    Class action status is also warranted under the other subsections of Rule 23(b) because: (i) prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants; (ii) Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory or other appropriate equitable relief with respect to the Class as a whole.

**COUNT I**
**Failure to Prudently and Loyally Manage the Plan's Assets**
**(Against All Defendants)**

87.    Plaintiffs incorporate the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

88.    At all relevant times, as alleged above, all Defendants were fiduciaries within the meaning of ERISA § 3(21)(a), 29 U.S.C. § 1002(21)(A) in that they exercised discretionary authority or control over the administration and/or management of the Plan or disposition of the Plan's assets.

89.    Under ERISA, fiduciaries who exercise discretionary authority or control over management of a plan or disposition of a plan's assets are responsible for ensuring that investment options made available to participants under a plan are prudent. Furthermore, such fiduciaries are responsible for ensuring that all investments in the Company's stock in the Plan were prudent and that such investment was consistent with the purpose of the Plan.  Defendants are liable for losses incurred as a result of such investments being imprudent.

90.     A fiduciary's duties of loyalty and prudence require it to disregard plan documents or directives that it knows or reasonably should have known would lead to an imprudent result or would otherwise harm plan participants or beneficiaries. ERISA § 404(a)(l)(D), 29 U.S.C. § 11 04(a)(l)(D). Thus, a fiduciary may not blindly follow plan documents or directives that would lead to an imprudent result or that would harm plan participants or beneficiaries, nor may it allow others, including those whom they direct or who are directed by the plans, including plan trustees, to do so.

91.     Defendants' duties of loyalty and prudence also obligate them to speak truthfully to participants, not to mislead them regarding the Plan or its assets, and to disclose information that Plan participants need in order to exercise their rights and interests under the Plan.  This duty to inform participants includes an obligation to provide participants and beneficiaries of the Plan with complete and accurate information, and to refrain from providing inaccurate or misleading information, or concealing material information, regarding the Plan's investments and investment options such that the Plan participants can make informed decisions with regard to the prudence of investing in such options made under the Plan.

92.     Defendants breached their duties to prudently and loyally manage the Plan's assets.  During the Class Period, Defendants knew that the JC Penney Common Stock Fund had become an imprudent investment for Plan participants' retirement savings because there was false and misleading information given to Plan participants and the public about JC Penney.

93.     Accordingly, Defendants should have taken appropriate responsive action of restricting transactions or new investments by the Plan in the JC Penney Common Stock Fund.

94.     Defendants also breached their duties of loyalty and prudence by failing to provide complete and accurate information regarding the Company's true financial condition and/or the Company's concealment of the same.  As such, Plan participants could not appreciate the true risks presented by investments in the Company's stock and, therefore, could not make informed decisions regarding their investments.

95.     As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly Plaintiffs and the Plan's participants, suffered foreseeable damage to and/or lost a significant portion of their retirement investments.  Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a) and ERISA § 409, 29 U.S.C. § 1109(a), Defendants are liable to restore the losses to the Plan caused by their breaches of fiduciary duties. or effectuating corrective disclosures regarding the false and misleading information.

## COUNT II
### Failure to Adequately Monitor the Independent Fiduciary and
### Provide the Independent Fiduciary with Accurate Information
### (Against All Defendants)

96.     Plaintiffs incorporate the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

97.     At all relevant times, as alleged above, Defendants were fiduciaries, within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

98.     At all relevant times, as alleged above, the scope of the fiduciary responsibility of the Defendants included the responsibility to appoint, evaluate, and

monitor other fiduciaries, including, the Independent Fiduciary, Evercore, to whom fiduciary responsibilities were delegated.

99.     The duty to monitor entails ensuring that Evercore, the Independent Fiduciary, had truthful and accurate information to fulfill its job as fiduciary and to properly monitor, evaluate and oversee the Plan's investment in the JC Penney Common Stock Fund.

100.     Under ERISA, a monitoring fiduciary must ensure that the monitored fiduciaries are performing their fiduciary obligations, and must take prompt and effective action to protect a plan and its participants when they are not.  In addition, a monitoring fiduciary must provide the monitored fiduciaries with complete and accurate information in their possession that they know or reasonably should know that the monitored fiduciaries must have in order to prudently manage a plan and its assets.

101.     Defendants breached their fiduciary monitoring duties by failing to provide the Independent Fiduciary, Evercore, with truthful and accurate information concerning its financial condition, progress towards its transformation and its liquidity, and knowing that Evercore was relying upon false information.

102.     As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly the Plaintiffs and the Plan's participants, suffered foreseeable damage to and/or lost a significant portion of their retirement investments.

103.     Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a) and ERISA § 409, 29 U.S.C. § 1109(a), Defendants are liable to restore the losses to the Plan caused by their breaches of fiduciary duties.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for:

A.      Determination that the instant action may be maintained as a class action under Rule 23, Federal Rules of Civil Procedure, appointing Plaintiffs as class representatives, and determining that Plaintiffs' counsel satisfies the prerequisites of Rule 23(g);

B.      Declaration that Defendants breached ERISA fiduciary duties owed to the Plan and its participants;

C.      Declaration that Defendants are not entitled to the protection of ERISA § 404(c)(1)(B), 29 U.S.C. § 1104(c)(1)(B);

D.      An Order compelling Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of their fiduciary duties, including losses to the Plan resulting from imprudent investment of the Plan's assets, and to restore to the Plan all profits Defendants made through use of the Plan's assets, and to restore to the Plan all profits which the participants would have made if Defendants had fulfilled their fiduciary obligations;

E.      Imposition a Constructive Trust on any amounts by which Defendants were unjustly enriched at the expense of the Plan as the result of breaches of fiduciary duty;

F.      An Order enjoining Defendants from any further violations of their ERISA fiduciary obligations;

G.      Actual damages in the amount of any losses the Plan suffered, to be allocated among the participants' individual accounts in proportion to the accounts' losses;

H.　　　An Order that Defendants allocate the Plan's recoveries to the accounts of all participants who had any portion of their account balances invested in JC Penney Common Stock Fund in proportion to the accounts' losses attributable to the decline in the price of JC Penney's common stock;

I.　　　Awarding the Plan and/or participants rescission and/or money damages including pre-judgment interest;

J.　　　An Order awarding costs pursuant to 29 U.S.C. § 1132(g);

K.　　　An order awarding attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

L.　　　An Order for equitable restitution and other appropriate equitable monetary relief against Defendants.

M.　　　Such other and further relief the Court deems just and equitable.

## DEMAND FOR JURY TRIAL

Plaintiffs and the Class request a jury trial for any and all Counts for which a trial by jury is permitted by law.

By: /s/ Jacob H. Zamansky
       Jacob H. Zamansky (JZ 1999)

Edward H. Glenn, Jr. (EG 0042)
Samuel E. Bonderoff (SB 1591)

**ZAMANSKY LLC**
50 Broadway, 32nd Floor
New York, NY 10004
Telephone: (212) 742-1414
Facsimile: (212) 742-1177
*jake@zamansky.com*

Bryan T. Forman
Texas State Bar No. 07258800

Forman Law Firm, P. C.
117 East Houston Street
Tyler, Texas 75702
Tel: 903-597-2221
Fax: 903-597-2224
bryan@formanlawfirm.com

ATTORNEYS FOR PLAINTIFFS