**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**TYLER DIVISION**

| | | |
|---|---|---|
| ROBERTO RAMIREZ and THOMAS IHLE, | § § § | |
| Plaintiffs, | § § | |
| v. | § § | Civil Action No. 6:14-CV-00601(KNM) |
| J.C. PENNEY CORPORATION INC., MICHAEL DASTUGUE, JANET DHILLON, KENNETH HANNAH, MICHAEL KRAMER, RONALD JOHNSON, and MYRON E. ULLMAN, III, | § § § § § § § | (ORAL ARGUMENT REQEUSTED) |
| Defendants. | § | |

**DEFENDANTS' MOTION TO DISMISS**
**THE FIRST AMENDED CLASS ACTION COMPLAINT**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES…………………………………………………...iv-viii

INTRODUCTION ................................................................................................ 1

BACKGROUND ................................................................................................. 4

    I. Evercore's Management of the Penney Stock Fund............................................ 4

    II. The Supreme Court's *Dudenhoeffer* Decision .................................................. 7

STATEMENT OF ISSUES ................................................................................. 9

STANDARD OF REVIEW ................................................................................. 9

ARGUMENT ..................................................................................................... 11

    I. Dismissal Ground I:  Plaintiffs Implausibly Allege that Defendants Breached
    ERISA Duties to Manage and to Monitor............................................................ 11

        A. Count I Fails Because Defendants' Fiduciary Duties Did Not Extend
        To the Management of the 401(k) Plan's Assets………………………….11

        B. Count II Fails Because Defendants Can Only Breach the Duty To
        Monitor if Evercore Breaches Its Fiduciary Duty and the Defendants
        Fail To Act……………………………………………………………….13

            1. Defendants' Duty To Monitor Did Not Include a Duty To Tip
            or Usurp…………………………………………………………….......15

            2. Defendants' Duty To Monitor Does Not Include a Duty To
            Supplement the Company's Securities Disclosures…………………17

    II. Dismissal Ground II:  Plaintiffs' Claim of Market Ignorance Is Implausible
    After *Dudenhoeffer* ............................................................................................... 18

III. Dismissal Ground III: Plaintiffs Have No Article III Standing to Bring
Their Claims, and Have Not Pled a Plausible Claim of Harm After *Dudenhoeffer*
............................................................................................................................... 27

    A. Plaintiffs Fail To Establish Standing ................................................... 27

    B. Plaintiffs Fail To Plead a Plausible Claim of Harm ............................ 28

CONCLUSION ............................................................................................................ 30

# TABLE OF AUTHORITIES

**Cases**                                                                                         **Page(s)**

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ................................................................................................. 9

*Baker v. Kingsley*,
    387 F.3d 649 (7th Cir. 2004) ................................................................................. 17

*Beddall v. State Street Bank & Trust*,
    137 F.3d 12 (1st Cir. 1998) ............................................................................. 12, 15

*Bell Atlantic Corp. v. Twombly*,
    550 U.S. 544 (2007) ................................................................................................. 9

*Bodine v. Emp'rs Cas. Co.*,
    352 F.3d 245 (5th Cir. 2003) ................................................................................. 19

*Brown v. Medtronic, Inc.*,
    619 F. Supp. 2d 646 (D. Minn. 2009), *aff'd*, 628 F.3d 451 (8th Cir.
    2010) ................................................................................................................ 27, 28

*Bunch v. W.R. Grace & Co.*,
    555 F.3d 1 (1st Cir. 2009) .................................................................................. 6, 12

*Camera v. Dell*,
    2014 WL 2767359 (W.D. Tex. Jun. 17, 2014) ...................................................... 16

*Camera v. Dell*,
    2014 WL 960897 (W.D. Tex. Feb. 26, 2014) ............................................. 13, 14, 16

*Collins v. Morgan Stanley Dean Witter*,
    224 F.3d 496 (5th Cir. 2000) ................................................................................... 9

*Donovan v. Bierwirth*,
    754 F.2d 1049 (2d Cir. 1985) ................................................................................ 28

*Fifth Third Bancorp v. Dudenhoeffer*,
    134 S. Ct. 2459 (2014) ................................................................................. passim

*Fitzpatrick v. Uni-Pixel, Inc.*,
    2014 WL 3773553 (S.D. Tex. July 25, 2014) ....................................................... 26

*Franks v. Prudential Health Care Plan, Inc.*,
    164 F. Supp. 2d 865 (W.D. Tex. Feb. 28, 2001) .................................................. 10

*Fulmer v. Klein*,
    2011 WL 1108661 (N.D. Tex. Mar. 16, 2011) ............................................14

*Gissin v. Endres*,
    739 F. Supp. 2d 488 (S.D.N.Y. 2010) ...............................................18, 26

*In re Boston Sci. Corp. ERISA Litig.*,
    254 F.R.D. 24 (D. Mass. 2008) ...........................................................28

*In re Capstead Mortg. Corp. Sec. Litig.*,
    258 F. Supp. 2d 533 (N.D. Tex. 2003) ................................................26

*In re Citigroup*,
    662 F.3d 128 (2d Cir. 2011) ...................................................................7

*In re Convergent Tech. Sec. Litig.*,
    948 F.2d 507 (9th Cir. 1991) ...............................................................25

*In re Dell, Inc. ERISA Litig.*,
    563 F. Supp. 2d 681 (W.D. Tex. 2008) ................................................14

*In re Delphi Corp. Sec., Derivative & ERISA Litig.*,
    602 F. Supp. 2d 810 (E.D. Mich. 2009) ..........................................12, 15

*In re Reliant Energy ERISA Litig.*,
    336 F. Supp. 2d 646 (S.D. Tex. 2004) ................................................16

*In re UBS ERISA Litig.*,
    2014 WL 4812387 (S.D.N.Y. Sept. 29, 2014) .....................................28

*In re Williams Cos. ERISA Litig.*,
    271 F. Supp. 2d 1328 (N.D. Okla. 2003) ............................................16

*Inst. Investors Grp. v. Avaya*,
    564 F.3d 242 (3d Cir. 2009) ................................................................18

*IP Innovation L.L.C. v. Google, Inc.*,
    661 F. Supp. 2d 659 (E.D. Tex. 2009) ................................................10

*Jones v. Aetna Life Ins. Co.*,
    2011 WL 6963165 (E.D. Tex. Dec. 15, 2011) .....................................10

*Kirschbaum v. Reliant Energy, Inc.*,
    526 F.3d 243 (5th Cir. 2008) ...........................................................11, 12

*Kopp v. Klein*,
    722 F.3d 327 (5th Cir. 2013), *judgment vacated on other grounds*, 134
    S. Ct. 2900 (2014) .............................................................10, 14, 16, 17

v

*Krim v. pcOrder.com, Inc.*,
    402 F.3d 489 (5th Cir. 2005) ...................................................................10

*Kuper v. Iovenko*,
    66 F.3d 1447 (6th Cir. 1995) ...................................................................19

*Kurtzman v. Compaq Computer Corp.*,
    2002 WL 32442832 (S.D. Tex. Mar. 30, 2002).........................................25

*LaLonde v. Textron, Inc.*,
    270 F. Supp. 2d 272 (D. R.I. 2003), *aff'd in part, rev'd in part*, 369
    F.3d 1 (1st Cir. 2004)................................................................................30

*Lanfear v. Home Depot, Inc.*,
    679 F.3d 1267 (11th Cir. 2012) ...............................................................16

*Lockheed Corp. v. Spink*,
    517 U.S. 882 (1996)............................................................................18, 19

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992)..................................................................................27

*Material Yard Workers Local 1175 Ben. Funds v. Men's Wearhouse Inc.*,
    2011 WL 3059229 (S.D. Tex. July 22, 2011)............................................26

*Moench v. Robertson*,
    62 F.3d 553 (3d Cir. 1995)..........................................................................7

*Pegram v. Herdrich*,
    530 U.S. 211 (2000)............................................................................11, 12

*Randall D. Wolcott, M.D., P.A. v. Sebelius*,
    635 F.3d 757 (5th Cir. 2011) ...................................................................10

*Rinehart v. Akers*,
    722 F.3d 137 (2d Cir. 2013), *judgment vacated on other grounds*, 134
    S. Ct. 2900 (2014)....................................................................................16

*Rivera v. Wyeth-Ayerst Labs.*,
    283 F.3d 315 (5th Cir. 2002) ...................................................................27

*Shushany v. Allwaste, Inc.*,
    992 F.2d 517 (5th Cir. 1993) ...................................................................26

*Simms v. Jones*,
    2011 WL 5978594 (N.D. Tex. Nov. 30, 2011)..........................................10

*Sommers Drug Stores Co. Emp. Profit Sharing Trust v. Corrigan Enters.,*
    *Inc.*, 793 F.2d 1456 (5th Cir. 1986) .......................................................................14, 15

*Southland Sec. Corp. v. INSpire Ins. Solutions, Inc.*,
    365 F.3d 353 (5th Cir. 2004) ................................................................................18, 25

*Taylor v. Keycorp*,
    2010 WL 3702423 (N.D. Ohio Aug. 12, 2010) ......................................................27, 28

*Xerox Corp. v. Genmoora Corp.*,
    888 F.2d 345 (5th Cir. 1989) ......................................................................................10

STATUTES

ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A)................................................................11, 12

ERISA § 3(38), 29 U.S.C. § 1002(38) ....................................................................6, 12, 15

ERISA § 402(a), 29 U.S.C. § 1102(a) ...............................................................................11

ERISA § 405(c)(d), 29 U.S.C. 1105(c)(d) ...................................................................12, 15

ERISA § 514(d), 29 U.S.C. § 1144(d)................................................................................18

PSLRA, 15 U.S.C. § 78u-5(c)(1)(A)(i)...............................................................................18

PSLRA, 15 U.S.C. § 78u-5(i)(1)(C) ...................................................................................25

PSLRA, 15 U.S.C. § 77z-2(i)(1)..........................................................................................18

Tax Reform Act of 1976, Pub. L. No. 94-455, § 803(h), 90 Stat. 1590
    (1976)..............................................................................................................................5

OTHER AUTHORITIES

29 C.F.R. § 2509.75-8.........................................................................................................13

*Fed. R. Civ. P.* 12(b)(1)................................................................................................10, 27

*Fed. R. Civ. P.* 12(b)(6)....................................................................................................1, 9

RESTATEMENT (SECOND) OF TRUSTS § 205 cmt. (e) ........................................................28

U.S. Const. Article III, § 2, cl. 1 ........................................................................................27

Defendants J. C. Penney Corporation, Inc. ("JCPenney" or the "Company") and the current and former JCPenney board members Michael Dastugue, Janet Dhillon, Kenneth Hannah, Ronald Johnson, Michael Kramer, and Myron E. Ullman, III respectfully move, pursuant to Rule 12(b)(6) and Rule 12(b)(1), to dismiss with prejudice the First Amended Class Action Complaint for Violations of ERISA ("Complaint") filed by Plaintiffs Roberto Ramirez and Thomas Ihle.

## INTRODUCTION

Congress has repeatedly expressed its intent to encourage through ERISA the investment by employees in employer stock.  JCPenney sponsors a 401(k) Plan for its employees, and includes as one of many investment options the Penney Stock Fund, which invests in the stock of the parent company, J. C. Penney Company, Inc. ("JCPenney stock").  JCPenney retained Evercore Trust Company ("Evercore") as the independent fiduciary and investment manager of the Penney Stock Fund.  This means that Evercore, rather than Defendants, has the exclusive authority to control, direct and manage the Penney Stock Fund's investment decisions.  This arrangement is prudent under ERISA because it provides independent, professional management of the fund, and insulates fund management from influence by corporate insiders.

Plaintiffs, in a novel effort seeking to rewrite established ERISA law, have sued Defendants, but not Evercore, for alleged breach of fiduciary duties concerning the Penney Stock Fund.  Plaintiffs assert that Defendants knew of and/or participated in a scheme to conceal from the market, including 401(k) plan participants, that the business transformation plan of former J. C. Penney Company, Inc. CEO, Defendant Ron Johnson, carried substantial risk and might not succeed.  Plaintiffs contend that the market's

1

ignorance of this risk artificially inflated the price of JCPenney stock, making it an imprudent plan investment.

Plaintiffs bring two counts based on this theory.  In Count I, they claim that Defendants breached an alleged fiduciary duty to prudently and loyally manage the plan's investment in Company stock.  In Count II, they claim Defendants breached their fiduciary duty to monitor Evercore.  Each of these claims, however, is fatally infirm.

Count I fails as a matter of law for the simple reason that Defendants' fiduciary duties did not extend to the control and management of the Penney Stock Fund.  The duty to prudently and loyally manage the Penney Stock Fund was vested *exclusively* in Evercore, the independent fiduciary and investment manager.  Defendants' fiduciary duty under ERISA extended only to monitoring Evercore's management of the Penney Stock Fund.  As a matter of long-established ERISA law, the duty to monitor does not include the duty to manage.

Count II fails because Plaintiffs do not claim that Evercore breached *its* fiduciary duties.  Where, as here, a company's directors have delegated authority and responsibility for controlling investment decisions to an independent investment manager, the directors' duty to monitor is limited to monitoring the investment manager to ensure it is qualified to perform its functions.  Under Fifth Circuit law, the duty to monitor is a derivative duty—there can be no breach of the directors' duty to monitor without an underlying breach of duty by the investment manager.  Because the Complaint fails to allege a breach of fiduciary duty by Evercore, Count II fails as a matter of law.

This pleading failure should end Plaintiffs' claim.  Plaintiffs, however, contend that this Court should expand the duty to monitor under ERISA to include duties to usurp

Evercore's function as an independent fiduciary and investment manager and to "tip" Evercore in violation of federal securities law. These contentions are insupportable under law and logic.

The duty to monitor does not include a duty to control, much less a duty to usurp the functions of an independent fiduciary and investment manager. Instead, ERISA grants investment managers the *exclusive* authority to manage funds placed under their control. The very reason an independent fiduciary and investment manager is appointed is to ensure that its actions as a fiduciary are free from control or interference by corporate insiders. Expanding the duty to monitor to include a duty to control or to usurp would be at odds with this well-established ERISA principle.

Likewise, the duty to monitor does not impose a duty to disclose, much less a duty to tip. Federal securities laws prohibit insider trading. Evercore therefore could not have lawfully used inside information to influence how it managed the 401(k) Plan's investment in JCPenney stock. Imposing on corporate insiders a duty to tip the independent fiduciary and investment manager with material non-public information also would be inconsistent with both the securities laws and ERISA. Simply put, 401(k) plan participants who choose to invest in JCPenney stock are not entitled to inside information for their personal advantage at the expense of other shareholders in the public markets.

Plaintiffs' underlying claim of imprudence also fails because Plaintiffs have not pled a plausible claim of market ignorance. Based on public disclosures, the market was well aware that this transformation plan had substantial risk and may not succeed, and no material information regarding this risk was concealed from the market. The market could not have been defrauded or misled, or was in any way ignorant of this risk. In *Fifth*

*Third Bancorp v. Dudenhoeffer*, 134 S. Ct. 2459, 2470-72 (2014), the Supreme Court held that in the absence of market ignorance or market failure (that the market no longer reliably prices the security), an ERISA fiduciary is entitled to rely on the market to value a security. Plaintiffs do not plead market failure. And Plaintiffs cannot plausibly plead market ignorance. Numerous public securities filings, newspaper reports, and press releases—all of which the Court may consider in deciding this motion—disclosed the risks that are the focus of the Complaint. Therefore, Plaintiffs cannot show that it was imprudent for Defendants to rely on the market to fairly and accurately value JCPenney stock.

Finally, Plaintiffs lack standing to sue and have not pled a plausible claim of harm or injury. Ramirez did not purchase any JCPenney stock during the proposed class period and Ihle acquired only a *de minimis* amount; thus they suffered no injury-in-fact from any claimed artificial inflation of the price of JCPenney stock during their proposed class period.

## BACKGROUND

### I.  Evercore's Management of the Penney Stock Fund

JCPenney sponsors the 401(k) Plan. *See* Ex. A, 401(k) Plan at 4 (definition of "Company").[1] The 401(k) Plan offers as one of its investment options the Penney Stock Fund.[2] *See id.* at 12 (definition of "Penney Stock Fund"), *id.* § 4.01A(a). The Penney

---

[1] Unless otherwise noted, all exhibits referenced herein are attached to the Declaration of Robert W. Rachal in Support of Defendants' Motion to Dismiss the First Amended Class Action Complaint, dated November 7, 2014.

[2] Currently, the Penney Stock Fund is one of twenty investment options offered in the 401(k) Plan. *See* Ex. B, 2012 401(k) Summary Plan Description ("SPD") at 19-24 (listing current investment options). Participants are free to direct their investments among these options. *See* Ex. A, 401(k) Plan §§ 4.03-05. The SPD informed participants

Stock Fund is an "employee stock ownership plan," i.e., an ESOP.  *Id.* at 1.  Congress has

repeatedly expressed its intent to encourage, including through ERISA, employee

investment in employer stock.  ESOPs have been described as a "bold and innovative

method of strengthening the free private enterprise system which will solve the dual

problems of securing capital funds for necessary capital growth and of bringing about

stock ownership by all corporate employees."  Tax Reform Act of 1976, Pub. L. No. 94-

455, § 803(h), 90 Stat. 1590 (1976).  Congress has explicitly expressed a concern that

courts should refrain from erecting barriers that would interfere with that goal:

> The Congress is deeply concerned that the objectives sought by [the series
> of laws encouraging ESOPs] will be made unattainable by regulations and
> rulings which treat employee stock ownership plans as conventional
> retirement plans, which reduce the freedom of the employee trusts and
> employers to take the necessary steps to implement the plans, and which
> otherwise block the establishment and success of these plans.

*Id.*

  While Congress has long encouraged employee investment in employer stock,

ESOPs present a unique challenge to the management of a company that sponsors one,

because they subject management to two independent, and sometimes competing,

fiduciary duties.  As officers of the company, management must carry out its corporate

fiduciary duty to shareholders for the purposes of maximizing shareholder wealth.  If

management is also an ESOP fiduciary, then it must administer the ESOP under ERISA

solely in the interest of plan participants, with the exclusive purpose of providing benefits

to them.  While not mutually exclusive, there is the potential for conflicts of interest

among these fiduciary duties when management finds itself in possession of material

---

of the risks of investing in the Penney Stock Fund, and that this fund was under the
exclusive control of Evercore.  *See* Ex. B, 2012 401(k) SPD at 32.

non-public information.  One solution to avoid potential conflicts is to appoint an independent fiduciary and investment manager for the ESOP.  This is considered "best practices" under ERISA, because the arrangement provides independent, professional management of the company stock fund, and insulates fund management from influence or control by corporate insiders.  *See, e.g.*, *Bunch v. W.R. Grace & Co.*, 555 F.3d 1, 8 (1st Cir. 2009).  For this reason, JCPenney has retained Evercore to serve as the independent fiduciary and investment manager of the Penney Stock Fund under ERISA § 3(38), 29 U.S.C. § 1002(38).  *See* Ex. C, Evercore Agreement.

Under this arrangement with Evercore, Defendants have no authority to control, direct, manage, or make investment decisions with respect to the Penney Stock Fund.  In fact, the Evercore Agreement provides that:

    i.    Evercore is the named fiduciary and investment manager for the Penney Stock Fund in the 401(k) Plan under ERISA § 3(38).  *Id.* ¶¶ 1, 6.

    ii.    As named fiduciary and investment manager, Evercore has "the ***exclusive*** fiduciary authority and responsibility" to restrict or eliminate investment in the Penney Stock Fund, including the power to sell all of the JCPenney stock held in that fund.  *Id.* ¶ 3 (emphasis added).

    iii.    As the named fiduciary and investment manager, Evercore has "the ***exclusive*** fiduciary authority and responsibility" to instruct the 401(k) Plan's trustee, State Street, to carry out the foregoing.  *Id.* ¶ 3 (emphasis added).

The 401(k) Plan provides that the Independent Fiduciary (Evercore) is the investment manager and named fiduciary for the Penney Stock Fund.  Ex. A, 401(k) Plan at 10 (definition of "Independent Fiduciary").  Further, like the Evercore Agreement, the 401(k) Plan states that Evercore "shall have the ***exclusive*** authority, responsibility and control with respect to management and disposition of the Penney Stock held in the Penney Stock Fund."  *Id.* § 4.01A(b) (emphasis added).  This exclusive authority and

6

control includes the power to restrict or eliminate investment in the Penney Stock Fund, including the power to order the sale of all JCPenney stock in that fund.  *Id.* § 4.01A(b).

Because Evercore is an independent fiduciary and investment manager under ERISA, the 401(k) Plan imposes a duty to monitor on the Board of Directors that is narrow in scope.  The 401(k) Plan (i) charges the Board of Directors to monitor Evercore as to its continued qualification, capacity, and personnel to perform its functions under the Plan, and (ii) allows the Board to remove Evercore by plan amendment.  *Id.* at 10 (definition of "Independent Fiduciary").

## II.  The Supreme Court's *Dudenhoeffer* Decision

Plaintiffs filed their claims shortly after the Supreme Court's decision in *Fifth Third Bancorp v. Dudenhoeffer*, which set forth the standards applicable to ERISA fiduciary claims for employer stock investments.  134 S. Ct. at 2459.  Fifth Third was a large bank, and plaintiffs alleged that investments in Fifth Third's stock became imprudent, "overvalued and excessively risky" by July 2007 because Fifth Third's subprime loan business was headed to a collapse.  *Id.* at 2464.

The Supreme Court recognized that Congress' expressed desire was to encourage employee investment in employer stock in ERISA plans, but held that the "presumption of prudence" that many courts had previously adopted was not the best vehicle to weed out meritless claims challenging these investments.[3]  *Id.* at 2470.  Instead, the Court concluded that this "important task can be better accomplished through careful, context-

---

[3] From 1995 to mid-2014, the standard adopted and used by the courts was the "*Moench* presumption of prudence," in which investment in an employer's stock was presumed prudent absent extraordinary circumstances, such as the impending collapse of the company.  *See, e.g.*, *Moench v. Robertson*, 62 F.3d 553, 571–72 (3d Cir. 1995); *In re Citigroup*, 662 F.3d 128, 140 (2d Cir. 2011).

sensitive scrutiny of a complaint's allegations." *Id.*

The Court then discussed how *Iqbal* and *Twombly's* plausibility standards applied to conduct the requisite "careful judicial consideration" of claims that a fiduciary breached its duties because company stock was an imprudent investment. *Id.* at 2471. For claims based on public information, the Court made it clear that rarely, if ever, could a fiduciary conclude a stock was imprudent when information was in the public domain: "In our view, where a stock is publicly traded, allegations that a fiduciary should have recognized *from publicly available information* alone that the market was over- or undervaluing the stock are implausible as a general rule, at least in the absence of special circumstances." *Id.* (emphasis added).  The Court defined "special circumstances" as market failure, i.e., that a defect in the trading market for the stock made the market's price unreliable. *Id.* at 2472.

For claims that a stock was overvalued and imprudent based on market ignorance (i.e., that material information about a company was not public), the Court again gave fiduciaries substantial defenses.  First, the Court made clear that ERISA fiduciaries cannot trade stock based on inside information, since doing so would violate the federal securities laws. *Id.*  Second, the Court noted:

> [C]ourts should consider the extent to which an ERISA-based obligation either to refrain on the basis of inside information from making a planned trade or to disclose inside information to the public could conflict with the complex insider trading and corporate disclosure requirements imposed by the federal securities laws or with the objectives of those laws.

*Id.* at 2473.  Third, the Court held that complaints should be scrutinized carefully to determine whether plaintiffs have plausibly alleged that unilateral disclosures or shutting down the stock fund would not cause more harm than good by alarming the market and

"causing a drop in the stock price and a concomitant drop in the value of the stock already held by the fund."  *Id.*

## STATEMENT OF ISSUES

I.   Dismissal Ground I:  Whether Plaintiffs' claims should be dismissed with prejudice because Plaintiffs fail to plead a plausible claim that Defendants breached the ERISA fiduciary duty to manage the Penney Stock Fund or to monitor Evercore.

II.   Dismissal Ground II:  Whether Plaintiffs' claims should be dismissed with prejudice because Plaintiffs fail to plead a plausible claim that the market was ignorant of the fact that the JCPenney business transformation plan had substantial risk.

III.   Dismissal Ground III:  Whether Plaintiffs' claims should be dismissed with prejudice for failure to allege (i) standing, and (ii) how Defendants lawfully could avoid the losses sustained by the Penney Stock Fund.

## STANDARD OF REVIEW

**Rule 12(b)(6)**.  Plaintiffs' claims should be dismissed pursuant to *Federal Rule of Civil Procedure* 12(b)(6). "To survive a motion to dismiss" under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  Thus, the complaint must include facts that "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.  As noted above, *Dudenhoeffer* instructs district courts to apply *Iqbal* and *Twombly* with vigor to screen out meritless claims challenging a plan's investments in the employer's stock.  *See Dudenhoeffer*, 134 S. Ct. at 2471–73.

On a motion to dismiss under Rule 12(b)(6), courts may consider documents that are "referred to in the plaintiff's complaint and are central to her claim." *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498-99 (5th Cir. 2000) (internal quotation

omitted).  "A document is central to a plaintiff's claim when it is necessary to establish

an element of that claim."  *Jones v. Aetna Life Ins. Co.*, 2011 WL 6963165, at *2 (E.D.

Tex. Dec. 15, 2011).  Thus, when the plaintiff asserts a claim under ERISA, the relevant

plan documents may be considered.  *See, e.g.*, *id.*; *accord Franks v. Prudential Health

Care Plan, Inc.*, 164 F. Supp. 2d 865, 871-72 (W.D. Tex. Feb. 28, 2001).  In cases

involving securities-related issues, the Court may also consider on a motion to dismiss

the contents of relevant public disclosure documents—such as Securities and Exchange

Commission ("SEC") filings—as well as press releases filed with the SEC.  *Kopp v.

Klein*, 722 F.3d 327, 333 (5th Cir. 2013), *vacated on other grounds*, 134 S. Ct. 2900

(2014); *see also Simms v. Jones*, 2011 WL 5978594, at *2 (N.D. Tex. Nov. 30, 2011)

(taking judicial notice of news articles to show "what facts were disclosed to the public").

**Rule 12(b)(1).**  Plaintiffs' suit should also be dismissed for lack of standing under

*Federal Rule of Civil Procedure* 12(b)(1).  Rule 12(b)(1) authorizes dismissal for lack of

subject matter jurisdiction when the district court lacks the statutory or constitutional

power to adjudicate the case.  *IP Innovation L.L.C. v. Google, Inc.*, 661 F. Supp. 2d 659,

662 (E.D. Tex. 2009).  Standing is an aspect of subject matter jurisdiction, and thus

appropriately adjudicated under Rule 12(b)(1).  *Xerox Corp. v. Genmoora Corp.*, 888

F.2d 345, 350-51 (5th Cir. 1989). The party asserting jurisdiction must carry the burden

of proof to avoid dismissal under Rule 12(b)(1).  *Randall D. Wolcott, M.D., P.A. v.

Sebelius*, 635 F.3d 757, 762 (5th Cir. 2011).  "In considering a challenge to subject matter

jurisdiction, the district court is free to weigh the evidence and resolve factual disputes in

order to satisfy itself that it has the power to hear the case."  *Krim v. pcOrder.com, Inc.*,

402 F.3d 489, 494 (5th Cir. 2005) (internal quotation omitted).

**ARGUMENT**

**I.   Dismissal Ground I:  Plaintiffs Implausibly Allege that Defendants Breached ERISA Duties to Manage and to Monitor**

Plaintiffs bring two counts.  In Count I they allege that Defendants breached their fiduciary duties to prudently and loyally manage the Penney Stock Fund.  Compl. ¶¶ 87-95.  In Count II they claim Defendants breached their fiduciary duties to monitor Evercore.  *Id.* ¶¶ 96-103.  Each of these claims fails as a matter of law for multiple, independent reasons.

**A.   Count I Fails Because Defendants' Fiduciary Duties Did Not Extend to the Management of the 401(k) Plan's Assets**

Count I is conclusory and fails for the simple reason that  Defendants had no fiduciary duty under ERISA to manage the 401(k) Plan's assets. *See Pegram v. Herdrich*, 530 U.S. 211, 225-26 (2000).  "ERISA liability arises only from actions taken or duties breached in the performance of ERISA obligations."  *Kirschbaum v. Reliant Energy, Inc.*, 526 F.3d 243, 256 (5th Cir. 2008) (quoting *WorldCom v. Reliant Energy, Inc.*, 263 F. Supp. 2d 745, 760 (5th Cir. 2008)); *see also Pegram*, 530 U.S. at 225-26.  Under ERISA, one becomes a fiduciary with respect to a specific duty or matter by (i) being designated as a named fiduciary in a plan document or identified as a fiduciary through a plan-specified procedure (*see* ERISA § 402(a), 29 U.S.C. § 1102(a)), or (ii) exercising "discretionary authority" or "discretionary responsibility" with respect to that duty or over that matter (*see* ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A)).  Therefore, under ERISA, an individual or entity is a fiduciary only "to the extent" the individual or entity has assumed or is allocated a fiduciary duty.  *E.g.*, *Pegram*, 530 U.S. at 225-26; *Kirschbaum*, 526 F.3d at 250-51; *see also* 29 U.S.C. § 1002(21)(A).  Accordingly, as a

11

threshold issue to bringing a claim for a breach of fiduciary duty, a plaintiff must show

the defendant was a fiduciary for the matter that is the subject of the claimed breach.

*E.g.*, *Pegram*, 530 U.S. at 226; *Kirschbaum*, 526 F.3d at 250-51.

Plaintiffs allege that "all Defendants were fiduciaries within the meaning of

ERISA § 3(21)(a), 29 U.S.C. § 1002(21)(A), in that they exercised discretionary

authority or control over the administration and/or management of the Plan or the

disposition of the Plan's assets."  Compl. ¶ 88.  But Defendants were not ERISA

fiduciaries with respect to the specific duty that forms the basis of Count I—the duty to

prudently and loyally manage the Penney Stock Fund portion of the 401(k) Plan's assets.

Here, pursuant to the terms of the 401(k) Plan and the agreement with Evercore, Evercore

is charged with sole, discretionary control to manage the Penney Stock Fund.  ERISA

assigns to an investment manager the exclusive fiduciary responsibility and control over

the investment he manages.  *See* ERISA §§ 3(38), 405(c),(d), 29 U.S.C. §§ 1002(38),

1105(c),(d) ("[I]f an investment manager has been appointed . . . no trustee shall be  . . .

under an obligation to invest or otherwise manage any asset of the plan which is subject

to the management of such investment manager[.]"); *see also, e.g.*, *Beddall v. State Street*

*Bank & Trust*, 137 F.3d 12, 20-21 (1st Cir. 1998); *In re Delphi Corp. Sec., Derivative &*

*ERISA Litig.*, 602 F. Supp. 2d 810, 821 (E.D. Mich. 2009).

Indeed, Evercore was appointed (i) because it is a qualified professional

investment manager that is independent of corporate insiders, and (ii) to preclude any

potential conflict of interest on the part of Defendants.  *Cf., e.g.*, *Bunch*, 555 F.3d at 8

(noting these benefits).  Evercore, not Defendants, had the exclusive responsibility under

ERISA to prudently and loyally manage the Penney Stock Fund.  Defendants (i) were not

12

designated as named fiduciaries in the 401(k) Plan, and (ii) did not exercise

"discretionary authority" or "discretionary responsibility" with respect to the Penney

Stock Fund.

The duty to prudently and loyally manage the Plan's assets was vested solely in

Evercore, an independent fiduciary and investment manager.  Defendants' fiduciary duty

under ERISA extended only to a duty to monitor Evercore, as discussed below.  Because

Defendants were not fiduciaries for the matter that is the subject of the claimed breach,

Plaintiffs' Count I fails as a matter of law.

### B.  Count II Fails Because Defendants Can Only Breach the Duty To Monitor if Evercore Breaches Its Fiduciary Duty and the Defendants Fail To Act

In Count II, Plaintiffs improperly seek to expand the duty to monitor and impose

additional duties on the Defendants that do not exist under ERISA.  Plaintiffs also

attempt to lay the predicate for an allegation that the market was ignorant of the risks

surrounding the JCPenney transformation strategy; this allegation is implausible based

upon the public disclosures.

Defendants' fiduciary duty under ERISA was limited to the duty to monitor

Evercore.  The duty to monitor is a circumscribed fiduciary duty, limited to periodically

monitoring the appointed party to see if she is complying with her fiduciary duties.  *See*

29 C.F.R. § 2509.75-8 (D-4) (stating "appoint and remove" liability is limited to the

selection and retention of fiduciaries); *id.* at (FR-17) (noting that there is a duty at

reasonable intervals to review the performance of the appointed fiduciary); *see also, e.g.*,

*Camera v. Dell*, 2014 WL 960897, at *5 (W.D. Tex. Feb. 26, 2014) (because benefits

committee could not act on inside information, board of directors did not act improperly

13

in supervising the committee).  Under ERISA's fiduciary "to the extent" rules, the power

to monitor does not include the power to manage or control.  *See Sommers Drug Stores

Co. Emp. Profit Sharing Trust v. Corrigan Enters., Inc.*, 793 F.2d 1456, 1460 (5th Cir.

1986).

The duty to monitor is of limited scope and cannot be breached unless the party

being monitored breaches one of its duties. *E.g., Kopp*, 722 F.3d at 344; *In re Dell, Inc.

ERISA Litig.*, 563 F. Supp. 2d 681, 695 (W.D. Tex. 2008) ("To be held responsible for a

failure to monitor or as a co-fiduciary, Plaintiffs must establish an underlying breach of

fiduciary duty."); *Camera*, 2014 WL 960897, at *5 (duty to monitor is a derivative

claim); *Fulmer v. Klein*, 2011 WL 1108661, at *6 (N.D. Tex. Mar. 16, 2011).  Here, there

is no claim that Evercore breached its duties in managing the Penney Stock Fund.  As a

result, there can be no claim that Defendants breached their duties in monitoring

Evercore.  *E.g., Kopp*, 722 F.3d at 344; *In re Dell, Inc. ERISA Litig.*, 563 F.Supp.2d at

695 ("To be held responsible for a failure to monitor or as a co-fiduciary, Plaintiffs must

establish an underlying breach of fiduciary duty.").  Accordingly, Plaintiffs' Count II

fails as a matter of law.

This should end the analysis.  Plaintiffs, however, attempt to contend that the duty

to monitor saddles Defendants with additional, novel obligations.  Plaintiffs allege that

the duty to monitor imposed on Defendants a duty: (i) to usurp the role of Evercore as the

independent investment manager by ordering Evercore to take actions to stop the

purchases of JCPenney stock; (ii) to tip Evercore with inside information; or (iii) to tell

the market of the claimed hidden problems by supplementing JCPenney's securities

disclosures.  Such obligations are not a part of the duty to monitor and are contrary to

14

ERISA and to sound policy.

1. *Defendants' Duty To Monitor Did Not Include a Duty To Tip or Usurp*

Contrary to Plaintiffs' allegations, Defendants have no ERISA duty to usurp Evercore's role as the independent investment manager of the Penney Stock Fund— indeed, it would be improper for them to do so.  The very reason an independent fiduciary is appointed is to ensure that fund management is free from control or interference by corporate insiders.  The power to monitor specifically does not include the power to manage or control.  *Sommers Drug Stores Co. Emp. Profit Sharing Trust*, 793 F.2d at 1460.  Rather, ERISA assigns the investment manager *exclusive* fiduciary responsibility and control over the investment he manages.  *See* ERISA §§ 3(38), 405(c),(d) ("[I]f an investment manager has been appointed . . . no trustee shall be  . . . under an obligation to invest or otherwise manage any asset of the plan which is subject to the management of such investment manager[.]"); *see also, e.g.*, *Beddall*, 137 F.3d at 20-21; *In re Delphi Corp. Sec., Derivative & ERISA Litig.*, 602 F. Supp. 2d at 821.  Thus, the Board's duty to monitor is limited to determining whether Evercore has the continued qualifications, capacity, and personnel to perform its functions under the plan. *See* Ex. A, 401(k) Plan, art. I.  Plaintiffs' contention that the Board's duty to monitor included a duty to usurp Evercore's role as the independent investment manager by ordering it to stop buying Company stock is unsupportable as a matter of precedent and unwise as a matter of policy.

Nor does the limited duty to monitor impose a duty on Defendants to tip Evercore with material non-public information.  The federal securities laws prohibit insider trading.  Thus, even if Defendants had given Evercore inside information about the

15

Company's performance, Evercore could not have used that information to influence how the 401(k) Plan traded in J.C. Penney stock. *See Dudenhoeffer*, 134 S. Ct. at 2472–73.

For this reason, ERISA fiduciaries do not have a duty to tip an independent investment manager with material non-public information. *See, e.g.*, Selective Disclosure and Insider Trading, SEC Release Nos. 33-7881 & 34-43154, 2000 WL 1201556, at *24 (Aug. 15, 2000) (an insider cannot influence the buying or selling of shares by a plan while in the possession of material, nonpublic information); *Rinehart v. Akers*, 722 F.3d 137, 154 (2d Cir. 2013) (directors had no duty to tip benefit committee members with inside information), *judgment vacated on other grounds*, 134 S. Ct. 2900 (2014); *Camera*, 2014 WL 960897, at *4 (appointing fiduciaries should not tip non-public information to the independent fiduciary).[4] As Judge Sparks explained in *Camera v. Dell*, such insider tipping "is wholly inconsistent with the spirit of the securities laws; it is, in essence, insider trading on a time delay," and it would allow employees to "take unfair advantage of the market." *Camera v. Dell*, 2014 WL 2767359, at *4-5 (W.D. Tex. Jun. 17, 2014). Simply put, employees are not entitled to have inside information used for their personal advantage at the expense of the other shareholders in the public markets.

---

[4] *See generally Kopp*, 722 F.3d at 339-40 (plan administrators do not have a duty to disclose non-public information); *Lanfear v. Home Depot, Inc.*, 679 F.3d 1267, 1284-86 (11th Cir. 2012); *In re Williams Cos. ERISA Litig.*, 271 F. Supp. 2d 1328, 1339 (N.D. Okla. 2003) (directors limited appointment fiduciary duties do not include duty to communicate plan information); *In re Reliant Energy ERISA Litig.*, 336 F. Supp. 2d 646, 659 (S.D. Tex. 2004) (fiduciary duty to appoint and remove benefits committee members does not impose duty to give them "all allegedly pertinent information").

2. *Defendants' Duty To Monitor Does Not Include a Duty To Supplement the Company's Securities Disclosures*

Plaintiffs also attempt to claim that ERISA's limited duty to monitor should be read expansively to impose fiduciary duties to supplement a public company's securities filings and disclosures, and implausibly assert that JCPenney had failed to disclose information regarding the Company's transformation strategy to the market.  This claim fails at multiple levels.  First, as noted, under ERISA, the duty to monitor is limited to monitoring the performance of the investment manager, not disclosing corporate information to the public.

Second, ERISA's fiduciary duties have never been construed to create a supplemental disclosure regime that displaces or supplements the comprehensive one provided by the federal securities laws—indeed, the law is to the contrary.  *See Kopp*, 722 F.3d at 340 ("[I]t is firmly established under our precedents that ERISA does not place a general duty on plan administrators to disclose all adverse inside information to the public. . . .  It is not the province of the courts to create such a duty out of whole cloth.") (internal citations omitted); *Baker v. Kingsley*, 387 F.3d 649, 662 (7th Cir. 2004) ("[I]f we were to create a new fiduciary duty [to disclose corporate well-being] we run the risk of disturbing the carefully delineated corporate disclosure laws.").

Third, respecting the primacy of federal securities laws is particularly important under the facts of this case.  The statements at issue here are predominately "forward looking statements," i.e., statements or predictions on the hoped-for impact of JCPenney's transformation plan.  The Private Securities Litigation Reform Act ("PSLRA") gives safe harbor protection from liability to forward-looking statements.

17

*See* 15 U.S.C. § 78u-5(c)(1)(A)(i).[5]  ERISA cannot be used to undermine Congress'

explicit intentions and protections set forth in the PSLRA.  Section 514(d) of ERISA, 29

U.S.C. § 1144(d), states that "[n]othing in this title shall be construed to alter, amend,

modify, invalidate, impair, or supersede any law of the United States . . . ."  Indeed, citing

ERISA § 514(d), *Dudenhoeffer* cautioned that "courts should consider the extent to

which an ERISA-based obligation . . . could conflict with the complex . . . federal

securities laws or with the objectives of those laws."  134 S. Ct. at 2473.  ERISA does not

create or impose a supplemental disclosure regime, and using ERISA to impose liability

here would further frustrate Congress' objectives in creating the PSLRA safe harbor.

Because the additional duties Plaintiffs seek to impose on the Defendants are

contrary to well-established law, Plaintiffs' attempt to impose them on the Defendants

fails and, as a result, Plaintiffs' Count II fails.

## II.  Dismissal Ground II:  Plaintiffs' Claim of Market Ignorance Is Implausible After *Dudenhoeffer*

Much of what Plaintiffs attempt to challenge is the wisdom (viewed through

hindsight) of JCPenney's business decisions.  But business decisions are not subject to

ERISA fiduciary duties, regardless of their impact on benefits.  *See, e.g.*, *Lockheed Corp.*

---

[5] With the PSLRA Congress intended to encourage companies to share future projections and plans with the market, and therefore has specifically protected these statements from liability as long as the projections were not made with actual knowledge they were false and they were identified as forward-looking and accompanied by meaningful cautionary language.  15 U.S.C. § 77z-2(i)(1).  Further, "predictions of future earnings and revenues . . . meet the PSLRA's definition of a forward-looking statement[.]"  *Southland Sec. Corp. v. INSpire Ins. Solutions, Inc.*, 365 F.3d 353, 372 (5th Cir. 2004); *see also Inst. Investors Grp. v. Avaya*, 564 F.3d 242, 254-56 (3d Cir. 2009); *Gissin v. Endres*, 739 F. Supp. 2d 488, 505-07 (S.D.N.Y. 2010) (statement that "Company's liquidity was strong" is a forward-looking statement).  Plaintiffs have not pled any facts—much less facts with the particularity demanded by the PSLRA—to justify imposing on this statutory safe harbor.

*v. Spink*, 517 U.S. 882, 890-91 (1996); *Kuper v. Iovenko*, 66 F.3d 1447, 1456 (6th Cir.

1995) *abrogated on other grounds by Dudenhoeffer*, 134 S. Ct. 2459 ("[P]urely business

decisions by an ERISA employer are not governed by section 1104's fiduciary

standards."); *Bodine v. Emp'rs Cas. Co.*, 352 F.3d 245, 251-52 (5th Cir. 2003) (same—

business decisions that impact benefits are not fiduciary actions). Accordingly, Plaintiffs'

challenge to the wisdom of these business decisions fails to state a cognizable claim

under ERISA.

In *Dudenhoeffer* the Supreme Court made clear that when information about a

company is in the public domain, a fiduciary is entitled to rely on the market to value that

security.  134 S. Ct. at 2471-72.  The Supreme Court recognized only two exceptions to

this rule.  The plaintiff must show market ignorance—that the information at issue was in

fact not in the public domain—or, in the absence of market ignorance, the plaintiff must

show market failure—that the market was no longer reliably pricing the security.

Plaintiffs do not (and could not) plead a claim of market failure for JCPenney stock.  And

post *Dudenhoeffer*, Plaintiffs have failed to plead a plausible claim that the Penney Stock

Fund was an imprudent investment based on market ignorance.

Plaintiffs also cannot plausibly allege that the market was unaware during the

proposed class period (from sometime in November 2011 to September 22, 2013)[6] that

JCPenney's transformation plan carried substantial risk.  During that time, public

disclosures and statements—all of which may be considered on a motion to dismiss—

show that the investing public was aware of the risks associated with the transformation.

JCPenney's public disclosures and statements included:

---

[6] *See*  Compl. ¶¶ 1 (Nov.1, 2011), 77 (Nov. 20, 2011).

- <u>December 2011</u>:  Even before JCPenney began rolling out its transformation strategy (the roll-out began in January 2012), JCPenney included in its Form 10-Q Risk Factors:[7]

  > We are planning changes to our pricing strategy for fiscal 2012, which could cause our sales to decline as our customers adjust to the new pricing strategy.  There can be no assurance that our new strategy, or any future modification of our strategies, will be successful or result in improved operating results or productivity.

  *See* Ex. D, JCPenney, Quarterly Report (Form 10-Q) at 31 (filed December 7, 2011, for the fiscal quarter ended October 29, 2011).

- <u>January 2012</u>:  JCPenney's January 2012 roll-out announcements noted that the risks to success included changes in store traffic patterns and the new pricing strategies.  *See* Ex. E, Press Release, *jcpenney's Transformation Plans Revealed at Launch Event in New York City* (Jan. 25, 2012); Ex. F, Press Release, *jcpenney Unveils Long Term Financial Outlook at Day Two of Launch Event in New York City* (Jan. 26, 2012).

- <u>March 2012</u>:  In its 10-K released on March 27, 2012, JCPenney revised the Risk Factors in its Form 10-K to provide that:

  > In 2011, we recruited a new executive team and announced plans to transform our business, including changes in our pricing strategy, marketing cadence, store layout and merchandise assortments.
  > . . . .
  >
  > There is no assurance that we will be able to successfully implement these strategic initiatives, which may result in an

---

[7] SEC rules require a publicly traded company to provide in its public filings, including Forms 10-Q and 10-K, under the caption "Risk Factors," a discussion of the most significant factors that investors should consider in deciding whether to make an investment. The Company is required to modify and update its "Risk Factors" in its Forms 10-Q and 10-K.

> adverse impact on our business and financial results.  In
> addition, the changes to our pricing strategies announced in
> January 2012 could result in a prolonged decline in sales.  There
> can be no assurance that our new pricing, marketing and
> merchandising strategies, or any future modifications of our
> strategies, will be successful or result in improved operating
> results or productivity.

Ex. G, JCPenney, Annual Report (Form 10-K) at 5, 6 (filed on March 29, 2012

for the fiscal year ended January 28, 2012).

- May 2012:  In its May 15, 2012 report on first quarter earnings, JCPenney noted

  that "[s]ales and profitability have been tougher than anticipated" and that there

  was work to be done to educate the customer about JCPenney's changes to its

  pricing and promotional practices.  *See* Ex. H, JCPenney, Current Report (Form

  8-K) Ex. 99.1 (May 15, 2012).  JCPenney further noted that it would incur

  additional restructuring charges and it may incur inventory write-downs as part of

  this transformation plan.  *Id.*  JCPenney also announced that it would discontinue

  its quarterly dividend, resulting in approximately $175 million in cash savings to

  help fund the transformation plan.  *Id.*

- June 2012:  In its 10-Q released on June 5, 2012, JCPenney reported large losses

  associated with the implementation of the new pricing strategy and noted that

  "[c]omparable store sales decreased 18.9% as compared to last year reflecting the

  impact of lower than expected sales during the early stages of our efforts to

  communicate to our customers our Fair and Square pricing."  Ex. I, JCPenney,

  Quarterly Report (Form 10-Q) at 14 (filed on June 6, 2012 for the fiscal quarter

  ended April 28, 2012).  JCPenney also stated, "There is no assurance that we will

  be able to successfully implement these strategic initiatives, which may result in

21

an adverse impact on our business and financial results." *Id.*  JCPenney further noted that "the changes to our pricing and marketing strategies announced in January 2012 could result in a prolonged decline in sales." *Id.*

- August 2012:  In its August 10, 2012 report on the second quarter earnings, JCPenney acknowledged that sales during the first six months of the new pricing strategy were "softer than anticipated" and that it would take time to see the positive results of the transformation plan.  The report also showed a 21.7% decline in second quarter comparable store sales.  *See* Ex. J, JCPenney, Current Report (Form 8-K) Ex. 99.1 (Aug. 10, 2012).

- November 2012:  In its November 9, 2012 report on the third quarter earnings, JCPenney announced that sales decreased by 26.6% and noted that the quarter overall was "challenging" and that the "old J.C. Penney" part of the company "continues to struggle and experience significant challenges . . . ." See Ex. K, JCPenney, Current Report (Form 8-K) Ex. 99.1 (Nov. 9, 2012).

- December 2012:  In its 10-Q released on December 4, 2012, JCPenney updated its Risk Factors to provide that:

> Our strategies to transform our business may not achieve the
> improvements we expect in our operating results. We are
> executing a number of strategic initiatives as part of our
> transformation, including changes in our pricing strategy,
> corporate branding, marketing, store layout and merchandise
> assortments. During this transition period, changes to our
> pricing and marketing strategies have resulted in a prolonged
> decline in sales and our results of operations have been
> significantly below our expectations. It may take longer than
> expected or planned to recover from our negative sales trends
> and operating results, and actual results may be materially less
> than planned.  . . .
>
> There can be no assurance that our efforts to increase

customer traffic and visit time in our stores will be successful
or will result in increased sales.

Ex. L, JCPenney, Quarterly Report (Form 10-Q) at 31, 32 (released December 4,

2012 for the fiscal quarter ended October 27, 2012).

- March 2013:  In its 10-K released on March 20, 2013, JCPenney discussed the

  difficulties encountered during the first year of the transformation plan and noted

  that it had "experienced, and anticipated[d] that [it would] continue to experience

  for at least the foreseeable future, significant competition from promotional

  activities of [its] competitors." Ex. M, JCPenney, Annual Report (Form 10-K) at 6

  (released March 20, 2013 for the fiscal year ended February 2, 2013).

- May 2013:  In its first report following Defendant Ullman's return as CEO,

  JCPenney announced that it was taking steps to stabilize the business with the

  goal of improving the balance sheet and reconnecting with customers. Ex. N,

  JCPenney, Current Report (Form 8-K) Ex. 99.1 (May 16, 2013).

- June 2013:  In its 10-Q released on June 11, 2013, JCPenney noted that it had

  begun to shift strategies in the first quarter of fiscal 2013 but warned that "it may

  take longer than expected or planned to recover from our negative sales trends

  and operating results, and actual results may be materially less than planned." Ex.

  O, JCPenney, Quarterly Report (Form 10-Q) at 27 (released June 11, 2013 for the

  fiscal quarter ended May 4, 2013).

Information about the risks associated with JCPenney's transformation strategy was also

disseminated widely in the public domain by commentators and the general press:

- January 2012:  *USA Today* reported on the transformation and pricing strategy

  that "the move is risky" because shoppers like to bargain hunt.  Ex. P, Anne

23

D'Innocenzio, *J.C. Penney slashing prices on all merchandise*, USAToday.com
(Jan. 27, 2012 10:11 a.m.).

- March 2012:  The business press reported that the new pricing strategy "could confuse long-term customers" and "could result in a prolonged decline in sales." Ex. Q, Reuters, *J.C. Penney sees risk of "prolonged" sales slide* (March 28, 2012 12:39 p.m.).

- May 2012:  Bloomberg Businessweek reported that the new pricing strategy could backfire and place JCPenney "at a competitive disadvantage when competitors run sales promotions" and that it might take three years for the new pricing strategy to become successful.  Ex. R, Alexander Cherney, *Why Everyday Low Pricing Might Not Fit J.C. Penney*, Bloomberg Businessweek (May 17, 2012).

- June 2012:  Following JCPenney's reporting of a large decline in sales, the *Dallas Morning News* questioned why testing was not done of the new marketing strategy.  *See* Ex. S, Maria Halkias, *J.C. Penney's CEO addresses question about testing retailer's pricing before it was put in place on Feb. 1*, Dallas Morning News Biz Beat Blog (June 5, 2012 8:57 a.m.).

- May 2013:  Following JCPenney's announcement that it was taking steps to stabilize the business with the goal of improving the balance sheet and reconnecting with customers, the business press noted some improvement in traffic but cautioned that JCPenney would continue to face difficulties in the coming year. *See* Ex. T, MarketWatch, *J.C. Penney's returning CEO Mike Ullman still faces a tough sell* (May 17, 2013 10:36 a.m.).

- August 2013:  CNNMoney reported improvements during JCPenney's second

24

quarter but noted that Ullman had a cautious outlook and quoted him as saying,
"To bet the ranch on a wild return to growth in a specific and short time period
wouldn't be prudent." See Ex. U, CNNMoney, *J.C. Penney posts big loss but
CEO is upbeat* (Aug. 20, 2013 4:13 p.m.).

In light of the foregoing, Plaintiffs' claim of market ignorance is implausible and
fails as a matter of law.  Information that "is already known to the market . . . cannot
defraud the market."  *Kurtzman v. Compaq Computer Corp.*, 2002 WL 32442832, at *22
(S.D. Tex. Mar. 30, 2002).  Where, as here, "the market has become aware of the
allegedly concealed information, the facts allegedly omitted by the defendant would
already be reflected in the stock's price, and the market will not be misled."  *In re
Convergent Tech. Sec. Litig.*, 948 F.2d 507, 513 (9th Cir. 1991) (internal quotation and
citation omitted).  After *Dudenhoeffer,* Plaintiffs fail to plead a plausible claim that the
market was ignorant of these transformation risks, and thus mispriced JCPenney stock.

Equally meritless is Plaintiffs' claim that JCPenney misled the market in August
2013 by predicting that it would end the year with $1.5 billion in liquidity.  *See* Compl. ¶
66.  To begin with, liquidity projections are immune from liability under the PSLRA's
safe harbor for forward-looking statements if they were accompanied by meaningful
cautionary language and made without actual knowledge of their falsity.  15 U.S.C.
§ 78u-5(i)(1)(C).  The August 20, 2013 liquidity projections *were* forward-looking
statements accompanied by meaningful cautionary language. *See* Ex. V, Tr. of Aug. 20,
2013 Q3 2013 J.C. Penney Co. Inc. Earnings Conf. Call at 1, 9; Ex. W, JCPenney,
Quarterly Report (Form 10-Q) at 38 (Sept. 10, 2013); Ex M, JCPenney, Annual Report
(Form 10-K) at 7-8 (Mar. 20, 2013).  *Compare Southland Sec. Corp.*, 365 F.3d at 372

("[P]redictions of future earnings and revenues . . . meet the PSLRA's definition of a forward-looking statement"); *Gissin*, 739 F. Supp. 2d at 505-507 (statement that "Company's liquidity was strong" is a forward-looking statement).

Further, Plaintiffs have not pled JCPenney *knew* its projections were false when made.  In any case, JCPenney's projection was close to the actual result, as the company ended the year with $1.238 billion in liquidity, excluding the proceeds of the September 2013 stock offering, and over $2 billion with those proceeds included.  *See* Ex. X, JCPenney, Annual Report (Form 10-K) at 38 (released Mar. 21, 2014) (showing stock proceeds and that ended 2013 with over two billion in liquidity).  *Compare Fitzpatrick v. Uni-Pixel, Inc.*, 2014 WL 3773553, at *11 (S.D. Tex. July 25, 2014) (disparity of more than 99% where forecast was 45,000 to 60,000 units and only 50 were shipped).

Regardless, even wildly inaccurate projections (which they were not), standing alone, are insufficient to raise a plausible claim of fraud.  *See Shushany v. Allwaste, Inc.*, 992 F.2d 517, 524-25 (5th Cir. 1993) ("Statements that are predictive in nature are actionable only if they were false when made.  . . . [P]rojections of future performance not worded as guarantees are generally not actionable under the federal securities laws.") (internal quotation omitted); *Material Yard Workers Local 1175 Ben. Funds v. Men's Wearhouse Inc.*, 2011 WL 3059229, at *5 (S.D. Tex. July 22, 2011) ("Earnings estimates are not results.  . . .  Categorically, earning less than predicted, by itself, is not fraud."); *In re Capstead Mortg. Corp. Sec. Litig.*, 258 F. Supp. 2d 533, 563 (N.D. Tex. 2003) ("[P]redictive statements are not 'facts' which are 'false' when made merely because the prediction turned out to be wrong.")

26

### III. Dismissal Ground III: Plaintiffs Have No Article III Standing to Bring Their Claims, and Have Not Pled a Plausible Claim of Harm After *Dudenhoeffer*

#### A. Plaintiffs Fail To Establish Standing

Plaintiffs have not established that they have standing to bring their claims. Article III of the United States Constitution restricts the judicial power of the federal courts to the adjudication of actual "Cases" and "Controversies."  U.S. Const. art. III, § 2, cl. 1; *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 559-60 (1992).  Standing is an "essential and unchanging part" of the case-or-controversy requirement.  *Lujan*, 504 U.S. at 560.  "The irreducible constitutional minimum of standing contains three elements:  [1] The plaintiff must have suffered an injury in fact, [2] there must be a causal connection between the injury and the conduct complained of, and [3] it must be likely that the injury will be redressed by a favorable decision."  *Rivera v. Wyeth-Ayerst Labs.*, 283 F.3d 315, 318 (5th Cir. 2002) (internal quotation and citation omitted).  Plaintiffs bear the burden of establishing all three of these elements, and "[f]ailure to establish any one deprives the federal courts of jurisdiction to hear the suit."  *Id.* at 318-19.

To show an injury-in-fact, "plaintiffs must demonstrate 'an invasion of a legally protected interest which is . . . concrete and particularized.'"  *Id.* at 319 (quoting *Lujan*, 504 U.S. at 560).  Here Ramirez and Ihle were only holders of the Penney Stock Fund during the proposed ERISA class period, with Ihle reinvesting only $22 in stock dividends during the entire class period.  *See* Exs. A & B to the Declaration of Aaron Minehan in Support of Defendants' Motion to Dismiss, dated November 7, 2014 ("Minehan Decl.").  A court can consider these limited facts under Rule 12(b)(1).  *See Taylor v. Keycorp*, 2010 WL 3702423, at *3-5 (N.D. Ohio Aug. 12, 2010); *Brown v. Medtronic, Inc.*, 619 F. Supp. 2d 646, 649 (D. Minn. 2009), *aff'd*, 628 F.3d 451 (8th Cir.

27

2010).

Ramirez and Ihle have suffered no injury-in-fact under their fraudulent inflation theory.  When the claim is that the fiduciaries caused the plan to pay too much for the stock, the harm is limited to the amount overpaid for a purchase.  *See* RESTATEMENT (SECOND) OF TRUSTS § 205 cmt. (e) (when fiduciary breached duties by paying too much for an asset, damages are measured by the difference in price between what was paid and what should have been paid); *Donovan v. Bierwirth*, 754 F.2d 1049, 1054 (2d Cir. 1985) (citing RESTATEMENT (SECOND) OF TRUSTS § 205 cmt. (e) as controlling when ERISA claim is that stock price was inflated or manipulated from hidden information); *see also Taylor*, 2010 WL 3702423, at *5 ("[T]he proper measure of damages in an 'artificial inflation' case is . . . the difference between what the plaintiff paid for the stock and what it was really worth . . . .  [P]laintiffs who benefit from the alleged artificial inflation of a security do not have standing to sue over it . . . ."); *Brown*, 619 F. Supp. at 650–51 (same), *aff'd*, 628 F.3d 451 (8th Cir. 2010); *In re Boston Sci. Corp. ERISA Litig.*, 254 F.R.D. 24, 30 (D. Mass. 2008) (same); *In re UBS ERISA Litig.*, 2014 WL 4812387, at *5-8 (S.D.N.Y. Sept. 29, 2014) (same).

Finally, Plaintiffs' claim that they individually suffered damages as holders (*see* Compl. ¶ 38) is contrary to ERISA (*see* RESTATEMENT (SECOND) OF TRUSTS, § 205, cmt. (e)) and is also too speculative, and too individualized on reliance, to make out a plausible class claim.

### B.  Plaintiffs Fail To Plead a Plausible Claim of Harm

Plaintiffs also have not pled a plausible claim of harm.  *Dudenhoeffer* instructs that district courts should review carefully whether plaintiffs have shown harm:  i.e., have

plaintiffs shown that fiduciaries would have done more good than harm by stopping purchases of an employer's stock, particularly since the market may take this as a sign that insiders thought the stock was a bad investment, "causing a drop in the stock price and a concomitant drop in the value of the stock already held by the fund." *Dudenhoeffer*, 134 S. Ct. at 2473.

There are several fatal flaws with Plaintiffs' claim of harm.  First, Defendants could not use inside information to tip Evercore, which would have been subject to the same prohibitions against profiting from inside information. *See Dudenhoeffer,* 134 S. Ct. at 2472 (fiduciary is barred by law from trading while in possession of material non-public information); Disclosure and Insider Trading, SEC Release Nos. 33-7881, 34-43154, 2000 WL 1201556, at *24 (Aug. 15, 2000) (an insider cannot influence the buying or selling of shares by a plan while in the possession of material, nonpublic information).  Any tip from Defendants would have frozen Evercore, who could not use inside information to order the independent trustee to stop buying stock while it was still *selling* stock for the Penney Stock Fund.[8] And here the 401(k) Plan was a large net seller of almost four million shares during the proposed ERISA class period (*see* Minehan Decl. Ex. C); thus had Defendants tipped Evercore, Defendants' conduct would have caused the 401(k) Plan substantial harm.

Second, no ERISA fiduciary duties compelled Defendants to take unilateral, extraordinary action to disclose information to the market.  Moreover, such extraordinary conduct would have alarmed the market, "causing a drop in the stock price and a

---

[8] The 401(k) Plan's assets are held in trust by State Street Bank and Trust Company ("State Street").  As trustee, State Street buys and sells the JCPenney stock held in the Penney Stock Fund. *See* Ex. B, 2012 401(k) Plan SPD at 37, 58 & 65.

concomitant drop in the value of the stock already held by the fund." *Dudenhoeffer*, 134 S. Ct. at 2473; *see also, e.g.*, *LaLonde v. Textron, Inc.*, 270 F. Supp. 2d 272, 280 (D.R.I. 2003), *aff'd in part, rev'd in part*, 369 F.3d 1 (1st Cir. 2004) (noting that if fiduciaries sold off stock, that itself risked triggering a broader sell-off and stock price decline).  And since the 401(k) Plan was a large net seller of stock during Plaintiffs' proposed class period, the risk that these pre-sale disclosures would have triggered stock fund losses renders implausible the claim such disclosures would have done more good than harm.

## CONCLUSION

The Complaint fails as a matter of law.  Among other defects, Plaintiffs fail to plead that Evercore, the entity charged with managing the Penney Stock Fund, breached any duty under ERISA.  Therefore, under controlling law, there can be no claim that Defendants breached their limited duty to monitor Evercore.  Plaintiffs' novel attempts to rewrite ERISA law to conjure up new duties to usurp Evercore's functions or to tip Evercore with inside information fail as a matter of law and public policy.  Plaintiffs' claims also fail because their allegations of market ignorance are implausible, because based on numerous public disclosures the market was aware that this transformation plan had substantial risk.  Finally, Plaintiffs lack standing and have not pled a plausible claim of harm.   Accordingly the Court should dismiss the Complaint with prejudice. Defendants respectfully request oral argument on this motion.

Dated: November 7, 2014                    Respectfully submitted,

By:  *s/ Howard Shapiro, with*
*permission by Michael E. Jones*
Howard Shapiro
*Pro hac vice* (LA Bar No. 11968)
Robert W. Rachal
*Pro hac vice* (LA Bar No. 22548)

Stacey C.S. Cerrone
*Pro hac vice* (LA Bar No. 25860)
PROSKAUER ROSE LLP
650 Poydras Street, Suite 1800
New Orleans, LA 70130
Telephone: (504) 310-4085
Fax (504) 310-2022
howshapiro@proskauer.com
rrachal@proskauer.com
scerrone@proskauer.com

GIBSON, DUNN & CRUTCHER
LLP
Robert C. Walters (SBN 20820300)
RWalters@gibsondunn.com
Olivia A. Adendorff (SBN
24069994)
OAdendorff@gibsondunn.com
2100 McKinney Ave., Suite 1100
Dallas, TX 75201-6912
(214) 698-3100

POTTER MINTON, PC
Michael E. Jones (SBN 10929400)
mikejones@potterminton.com
110 North College, Suite 500
Tyler, TX 75702
(903) 597-8311

*Counsel for Defendants*

31

**<u>CERTIFICATE OF SERVICE</u>**

  The undersigned hereby certifies that all counsel of record who are deemed to

have consented to electronic service are being served with a copy of this document and

all attachments hereto via the Court's CM/ECF system per Local Rule CV-5(a)(3) on

November 7, 2014.


               */s/ Michael E. Jones*
               Michael E. Jones